[Cite as *State v. Costell*, 2016-Ohio-3386.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                 CASE NO.  14-15-11

      v.

JON JAMES COSTELL,                 O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 2014-CR-0127

**Judgment Affirmed**

Date of Decision:   June 13, 2016

APPEARANCES:

    *Paula Brown* **for Appellant**

    *David W. Phillips* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Jon James Costell ("Costell"), appeals the April 20, 2015 judgment entry of sentence of the Union County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case stems from the overdose death of Debra Costell ("Debra") on September 25, 2013. Debra was a bedridden paraplegic suffering from chronic obstructive pulmonary disease ("COPD"), depression, and two stage IV decubitus ulcers—bed sores. Debra, who lived at home with her husband, Costell, received in-home healthcare from home-healthcare aids and nurses until she was hospitalized in July 2013. When Debra returned home on August 21, 2013, she received only in-home nursing care until her death. Debra was prescribed a number of medications, including Tramadol, to treat her pain, and Sertraline, to treat her depression. Debra's nurses were responsible for staging her pillbox with her daily prescribed medications, and Costell was responsible for administering to Debra her medications from her pillbox and her as-needed medications, which were not staged in her pillbox. Debra's cause of death was determined to be acute intoxication from the combined effects of Tramadol and Sertraline. Among other medications, Debra was prescribed 100 milligrams—1 pill—of Sertraline per day, and prescribed 50 milligrams up to 3 times per day as needed—up to 3 pills—of Tramadol.

{¶3} On June 22, 2014, the Union County Grand Jury indicted Costell on four counts, including: Count One of aggravated murder in violation of R.C. 2903.01(A), (F) and 2929.02(A), an unclassified felony; Count Two of failing to provide for a functionally impaired person in violation of R.C. 2903.16(A), (C)(1), a fourth-degree felony; Count Three of domestic violence in violation of R.C. 2919.25(B), (D)(4) a third-degree felony; and Count Four of involuntary manslaughter in violation of R.C. 2903.04(A), (C), a first-degree felony. (Doc. No. 1).

{¶4} On July 23, 2014, Costell appeared for arraignment and entered pleas of not guilty to the counts of the indictment. (Doc. No. 4).

{¶5} The case proceeded to a jury trial on April 13-16, 2015. On April 16, 2015, the jury found Costell guilty as to the counts in the indictment. (Doc. Nos. 109, 110, 111, 112); (Apr. 16, 2015 Tr. at 68-70). On April 20, 2015, the trial court sentenced Costell to life in prison with parole eligibility after serving 25 years on Count One and 36 months in prison on Count Three, and it ordered that Costell serve the terms consecutively. (Doc. No. 115); (Apr. 20, 2015 Tr. at 13). The parties agreed that Counts Two and Four merged with Count One. (*Id.*); (*Id.* at 12).

{¶6} On May 13, 2015, Costell filed his notice of appeal. (Doc. No. 126). He raises nine assignment of error for our review. For ease of our discussion, we

-3-

will first review together Costell's eighth and sixth assignments of error; followed separately by his second and first assignments of error; then together his fifth, seventh, and ninth assignments of error; and finally together his third and fourth assignments of error.

### Assignment of Error No. VIII

**The Trial Court Erred When it Did Not Grant Defendant's Rule 29 Motion at End of State's Case and at End of the Trial.**

### Assignment of Error No. VI

**The Verdict Was Against the Manifest Weight of the Evidence and Defendant's Conviction Was Not Supported by Sufficient Evidence.**

{¶7} In his eighth assignment of error, Costell argues that the trial court erred by denying his Crim.R. 29 motion because the State "never proved [Costell] caused Debra's death." (Appellant's Brief at 33). In his sixth assignment of error, Costell argues that his convictions are against the manifest weight of the evidence and based on insufficient evidence.

{¶8} "Under Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Tatum*, 3d Dist. Seneca No. 13-10-18, 2011-Ohio-3005, ¶ 43, citing *State v. Bridgeman*, 55 Ohio St.2d 261, 263 (1978). "A motion for acquittal tests the sufficiency of the evidence." *Id.*, citing *State v.*

*Miley*, 114 Ohio App.3d 738, 742 (4th Dist.1996). As such, we will review together Costell's arguments under his sixth and eighth assignments of error that his convictions are not supported by sufficient evidence.

**{¶9}** Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address each legal concept individually.

**{¶10}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997), fn. 4. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No.

4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{¶11} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶12} It appears that Costell is challenging only his aggravated-murder conviction under R.C. 2903.01(A) in his sixth and eighth assignments of error. R.C. 2903.01(A) provides, "No person shall purposely, and with prior calculation and design, cause the death of another * * *." Accordingly, to prove that Costell

committed aggravated murder under R.C. 2903.01(A), the State was required to prove: (1) Costell acted purposely; (2) Costell acted with prior calculation and design; and (3) Costell caused Debra's death. *See* R.C. 2903.01(A); *State v. Williams*, 8th Dist. Cuyahoga No. 98528, 2013-Ohio-1181, ¶ 24; *State v. Neeley*, 143 Ohio App.3d 606, 620 (1st Dist.2001). "A person acts purposely when it is the person's specific intention to cause a certain result * * *." R.C. 2901.22(A). The Supreme Court of Ohio defines "prior calculation and design" as requiring "evidence of 'more than the few moments of deliberation * * * and * * * a scheme designed to implement the calculated decision to kill.'" *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 38, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11 (1978).

{¶13} Because it is the only element Costell challenges on appeal, we review the sufficiency of the evidence supporting only whether Costell caused Debra's death, and whether the jury clearly lost its way in concluding that Costell caused Debra's death.

{¶14} At trial, the State presented the testimony of 25 witnesses. The testimony relevant to Costell's sixth and eighth assignments of error is summarized below.

{¶15} As its first witness, the State presented the testimony of Union County Sheriff's Office 9-1-1 dispatcher Rebecca Heath ("Heath"), who testified

that she received a 9-1-1 emergency call from Costell at 5:31 a.m. on the morning of September 25, 2013 while she was working as a dispatcher. (Apr. 13, 2015 Tr., Vol. II, at 196-197, 201). Heath identified State's Exhibit 1 as a true and accurate audio recording of Costell's 9-1-1 call, which was subsequently played for the jury. (*Id.* at 197-198, 202). Heath testified that Costell seemed calm at times and at other times he seemed to be "somewhat unwilling or abrupt." (*Id.* at 202, 203). According to Heath, Costell seemed to be "a little calmer than most." (*Id.* at 203).

{¶16} Next, Todd L. Simmons ("Simmons"), a firefighter and EMT for Union Township, testified that he responded to the Costell residence on September 25, 2013 as a result of Costell's 9-1-1 call. (*Id.* at 206, 208). According to Simmons, Costell "said he didn't do CPR on her, but * * * he said he did try to do rescue breaths." (*Id.* at 212). Heath testified that Costell did not "seem too upset" and that Costell "just kept saying: I know she's gone." (*Id.* at 214).

{¶17} Union County Sheriff's Deputy James M. Inskeep ("Deputy Inskeep") testified that he was dispatched to the Costell residence on September 25, 2013. (*Id.* at 217-218). Deputy Inskeep testified that Costell told him that Debra had been "pretty sick," requiring Costell to quit his job to stay home and care for her "full time." (*Id.* at 222-223). According to Deputy Inskeep, Costell

> mentioned that that night she was sleeping in the bed and he tends to
> sleep on the couch and that morning when he got up to check on her,

that he noticed the nasal tubing for the oxygen was off her face and that when he was checking on her, that she needed CPR.

(*Id.* at 223). Regarding the CPR, Deputy Inskeep testified that Costell told him that he had a terrific time trying to turn her and straighten her out because of her physical, medical conditions; and then he said when he did get her flat, which was very hard to do, that when he started the CPR, that the cracking of the bones really disturbed him.

(*Id.*). Deputy Inskeep testified that he "took [from the scene] a bag of prescription drugs that [Costell] gave him." (*Id.* at 224). According to Deputy Inskeep, the medication was already "bagged up," and he took it because "[i]t's custom that we take all the medication when a person passes away at home, we take that and give it to the coroner so that it can be inventoried and be counted to make sure that we have everything in the house." (*Id.* at 224-225). He testified that he transported the bag of Debra's medications to the Sheriff's Office and left the bag in the dispatch room for Investigator Paul L. Slaughter ("Investigator Slaughter") of the Union County Coroner's Office to retrieve. (*Id.* at 231-232). Deputy Inskeep testified that Costell explained to him that he kept Debra's medications in a lockbox because he was afraid of it being stolen and because "she would get into her medication and try to take too much medication." (*Id.* at 225). Deputy Inskeep testified that Costell informed him that he was the "only person to have

the key to the box" that contained Debra's medications and that he administered her medications to her. (*Id.* at 226). Deputy Inskeep testified, "In most of the cases I've ever been around with a death, the person always talks about the loss of a relationship, the loss of a loved one and it's going to be hard * * *." (*Id.*). However, according to Deputy Inskeep, Costell's demeanor was "different" than that because "most of the time he talked about himself." (*Id.*).

{¶18} On cross-examination, Deputy Inskeep testified that he did not inventory the medications provided to him by Costell. (*Id.* at 231-232).

{¶19} Dr. Prasanna K. Muniyappa ("Dr. Muniyappa") testified that Debra was his patient since 2010. (*Id.* at 285, 287). According to Dr. Muniyappa, Debra suffered from COPD, depression, paralysis resulting in her inability to walk, and two stage IV decubitus ulcers. (*Id.* at 288-289, 291). Dr. Muniyappa testified that Debra had been bedridden since 2008. (*Id.* at 288). Dr. Muniyappa testified that he was surprised to learn that Debra passed away because he had "seen her a couple of weeks earlier" and, even though she was "not in the best of health," he "did not expect her to pass away so soon." (*Id.* at 303-304).

{¶20} Dr. Muniyappa testified that he prescribed Debra two pain medications—Tramadol and Vicodin—and that Debra had been taking the dosage of Tramadol that she was taking at the time of her death since 2011. (*Id.* at 292-293). Dr. Muniyappa confirmed that Debra's prescribed dosage of Tramadol was

not increased. (*Id.* at 293). Dr. Muniyappa testified that he prescribed Debra Sertraline to treat her depression and that she was taking the dose of Sertraline that she was taking at the time of her death for at least a year. (*Id.* at 294). Unlike the Tramadol, which Debra was to take on an as-needed basis for pain, Debra was to take the Sertraline every day. (*Id.* at 293, 295). According to Dr. Muniyappa, Debra did not complain to him about any interactions between the Tramadol and Sertraline. (*Id.* at 295). Dr. Muniyappa testified, "Usually when there's an interaction between the two drugs, you're going to see it sooner than later; so within the first month, two months, maybe even three months, you would see some problem with that medicine." (*Id.*).

{¶21} On cross-examination, Dr. Muniyappa testified that Debra also "suffered from the effects of [Wernicke-Korsakoff syndrome ("Korsakoff syndrome")]," "which is * * * a long-standing illness brought on by alcohol use and thiamine deficiency." (*Id.* at 305). According to Dr. Muniyappa, it is possible for a person diagnosed with Korsakoff syndrome to exhibit "some liver issues" if that person is "a heavy drinker." (*Id.*). Yet, Dr. Muniyappa testified that he was not actively treating Debra for that disease because "[t]here really is no treatment at that point other than just try to help with nutrition." (*Id.* at 307, 308). Dr. Muniyappa testified that Debra's health was declining because "she had these

chronic issues, she continued to smoke, she had bad COPD * * * [and] she was not in the best of health." (*Id.* at 316).

{¶22} On redirect examination, Dr. Muniyappa testified that he was not aware of any effect that Debra's Korsakoff syndrome had on her liver, and that Debra was not diagnosed with any other liver issues. (*Id.*). According to Dr. Muniyappa, Debra's prescriptions would not have any effect on her liver if they were taken at their prescribed levels. (*Id.* at 317-318).

{¶23} Kimberly Reedy ("Reedy"), a lead investigator with the Ohio Department of Medicaid, testified that she became involved in the case as part of the Ohio Department of Medicaid's "100 percent death review" and because her office "received [a referral] from CareStar[, the Ohio Department of Medicaid's contracting case-management agency for Debra's care,] as an alert, saying [Reedy's office] need[s] to look at this case." (*Id.* at 279). Reedy testified that she reported her concerns regarding Debra's death to the Union County Coroner's Office and the Union County Sheriff's Office. (*Id.* at 284).

{¶24} Investigator Slaughter testified that he was dispatched to the Costell residence on September 25, 2013, and that he initially thought that an autopsy was unnecessary since Debra had extensive medical issues. (*Id.* at 235, 237, 247-248). However, he testified that the Union County Coroner, Dr. David T. Applegate ("Dr. Applegate"), informed him the next day that an autopsy would be performed

because Dr. Applegate received "a complaint from the state about possible abuse from some of the home health nurses and people that had seen [Debra]." (*Id.* at 250-251).

**{¶25}** Investigator Slaughter testified that, on the date of Debra's death, Costell provided to him Debra's medications that were in her pillbox and that Costell told him that he had to keep her medication locked up "because it's been stolen before." (*Id.* at 242). According to Investigator Slaughter, he is required by state law to "receive all medicine of someone that is deceased * * * for evidence." (*Id.* at 243). He testified that he retrieved from the Sheriff's Office dispatch room the bag of Debra's medications that Deputy Inskeep transported from the Costell residence to the Sheriff's Office. (*Id.* at 243-244). Investigator Slaughter testified that he inventoried Debra's medications "to see if all the mediations were there, if there was any that was missing, [and] if they had been taken regularly or not." (*Id.* at 247). However, Investigator Slaughter admitted that he had no way of knowing whether Debra was taking her medications as ordered or whether there were any medications missing. (*Id.*). He also admitted that he did not search the Costell residence for any additional pills or pill bottles. (*Id.*).

**{¶26}** Investigator Slaughter testified that he asked Costell what happened, and Costell told him that Debra went to bed at approximately 10:00 p.m. the night before with her oxygen on, but when he went to wake her in the morning, she did

not have her oxygen on and she was unresponsive. (*Id.* at 244). Investigator Slaughter testified that Costell told him that Debra did not have any "recent complaints." (*Id.*). He testified that Costell told him that the 9-1-1 dispatcher told him to perform CPR on Debra but he could not get her on the floor to perform the CPR. (*Id.* at 245).

{¶27} Investigator Slaughter testified that he called Costell to inform him that Dr. Applegate decided to perform an autopsy on Debra's body, but did not tell Costell that Dr. Applegate ordered the autopsy as a result of a complaint. (*Id.* at 251). According to Investigator Slaughter, Costell was "very agitated" that Debra's body was going to be autopsied—that is, Costell told Investigator Slaughter that he did not think an autopsy needed to be done since "he had done nothing wrong." (*Id.* at 252). Investigator Slaughter testified that Costell repeated, throughout their 30-40 minute telephone conversation, that there was no reason for an autopsy because he had not done anything wrong. (*Id.* at 253-254). He also testified that Costell's statement to him that "I've been off work, I had to do something" was, in hindsight, odd. (*Id.* at 254). Investigator Slaughter testified that he again spoke with Costell approximately six to eight weeks later but before the autopsy and toxicology reports were concluded. (*Id.* at 255). He testified that Costell again repeated that he did not understand why an autopsy was necessary because "he had done nothing but take care of her, that he had done nothing

wrong." (*Id.*). However, Investigator Slaughter testified that Costell did not inquire as to the results of the autopsy. (*Id.* at 256). He testified that he spoke with Costell a third time once the autopsy and toxicology reports were completed. (*Id.*). According to Investigator Slaughter, Costell said, "You know, you told me that she didn't need an autopsy, that you thought it was natural causes and that - - is there anything you can do for me." (*Id.* at 256-257). Investigator Slaughter testified that he informed Costell that the conversation was inappropriate, that he was hanging up the phone, and that Costell was not to call back. (*Id.* at 257).

{¶28} On cross-examination, Investigator Slaughter testified that he did not ask Costell why he could not get Debra off the bed to perform CPR. (*Id.* at 259).

{¶29} Detective Michael S. Justice ("Detective Justice") of the Union County Sheriff's Office testified that he investigated Debra's death at the request of the Union County Coroner's Office. (Apr. 15, 2015 Tr. at 75, 77). Detective Justice identified State's Exhibit 40 as a true and accurate recording of his April 8, 2014 interview of Costell, which was subsequently played for the jury. (*Id.* at 78-79). Detective Justice testified that he executed a search warrant that day and seized as evidence 2012 and 2013 calendars, which he identified as State's Exhibits 54 and 55, respectively. (*Id.* at 94-95). Detective Justice testified that he discussed the calendars with Costell and, in particular, a notation on the 2013 calendar across September 17, 18, and 19 indicating "Deb had bad days." (*Id.* at

96-97). (*See also* State's Ex. 55). He further testified that Costell told him that the notations were in his handwriting. (Apr. 15, 2015 Tr. at 96). Detective Justice identified State's Exhibit 7 as the bag of Debra's medications that Costell provided to Deputy Inskeep on September 25, 2013. (*Id.* at 94). He testified that he retrieved the bag of Debra's medications from the Union County Coroner's Office and provided the bag to Lonnie Craft ("Craft"), a pharmacist with Plain City Druggist, in Plain City, Ohio, for him to inventory and review the medications contained in the bag. (*Id.*).

{¶30} On cross-examination, Detective Justice testified that he did not inform Costell that he was recording his interview. (*Id.* at 99).

{¶31} David Burke ("Burke"), a pharmacist with Dave's Pharmacy in Marysville, Ohio, testified that Debra filled her prescriptions with his pharmacy. (Apr. 14, 2015 Tr., Vol. I, at 9, 13). Burke identified State's Exhibit 16 as a true and accurate copy of Debra's prescription profile record from January 1, 2011 through September 25, 2013. (*Id.* at 15-16). He testified that Debra's Sertraline prescription was last filled on September 6, 2013 with 30 pills constituting a 30-day supply and that her Tramadol prescription was last filled on September 6, 2013 with 90 pills constituting a 30-day supply. (*Id.* at 23-24).

{¶32} Burke testified Debra was prescribed the same dose of Sertraline and Tramadol for more than a year and that Debra did not report to him any

interactions or problems with her prescriptions. (*Id.* at 31). According to Burke, if Debra experienced any interactions between the Tramadol and Sertraline, she would have experienced serotonin syndrome, which "will occur generally within a week to four weeks" causing a person to feel "out of sorts" before experiencing physical conditions, including seizures and tardive dyskinesia. (*Id.* at 31-32). Burke further testified, "This would go on for an extended period of time. It is a very chronic condition. You would know that you had this." (*Id.* at 32-33). Burke testified that his wife, who is also a pharmacist and who delivered Debra's prescriptions, "was there a few weeks before [and] actually conversed with her - - she could have relayed [any perceived side effects] at any time and we never perceived [the side effects were] occurring." (*Id.* at 33). According to Burke, taking a higher-than-prescribed dose of Sertraline and Tramadol can be life threatening. (*Id.* at 34). In particular, Burke testified that taking a higher-than-prescribed dose of Tramadol "can lead to respiratory depression." (*Id.*).

{¶33} On cross-examination, Burke testified that Debra's Tramadol prescription was filled approximately every 30 days between July 2012 and June 26, 2013. (*Id.* at 36). However, Burke testified that his pharmacy did not fill Debra's Tramadol prescription between June 26, 2013 and September 6, 2013. (*Id.* at 38). Burke testified that his pharmacy filled "five or six regularly-scheduled medications" for Debra each month. (*Id.* at 40-41).

**{¶34}** Next, Craft testified that Detective Justice asked him to examine the bag of medications that Costell provided to law enforcement on September 25, 2013. (*Id.* at 47-48). Craft identified State's Exhibit 19 as the report of the inventory that he conducted of Debra's bag of medications. (*Id.* at 49). State's Exhibit 19 reflects that there were 50 Tramadol tablets filled under prescription number 6462318, 10 Sertraline tablets filled under prescription number 7395540,[1] and 16 Sertraline tablets filled under prescription number 6442504. (State's Ex. 19). (*See also* Apr. 14, 2015 Tr., Vol. I, at 50-51).

**{¶35}** Nicole McClintock ("McClintock") testified that she is the director of nursing for the company that provided in-home nursing services for Debra from May 2013 through the time of her death. (Apr. 14, 2015 Tr., Vol. I, at 89, 91, 96-97). She testified that she formulated, in conjunction with Dr. Muniyappa, Debra's plan of care, known as a "485 plan," which describes "what we're going to be doing, what we're going to be teaching, how we're going to be doing wound care, the medications the patient's on." (*Id.* at 92-93). McClintock identified State's Exhibit 13 as Debra's 485 plan that was certified from August 21, 2013 through October 19, 2013. (*Id.* at 93-94). She further testified that Debra's 485 plan reflects Debra's diagnoses, "which [are] the main reason[s] that [a medical professional is] going in to see the patient[,]" as including "[p]ressure ulcer in [sic]

---

[1] Prescription number 7395540 is not one of the prescriptions indicated as being filled by Dave's Pharmacy. (*See* State's Ex. 16).

the lower back and pressure ulcer on the hip, paraplegia, COPD with no exacerbation, [and] epilepsy." (*Id.* at 94-95).

**{¶36}** McClintock identified State's Exhibit 7 as Debra's pillbox. (*Id.* at 125). She testified that Debra's 485 plan required one 100-milligram pill of her Sertraline to be put "into the bedtime tab" of her pillbox, but did not require her Tramadol to be put into her pillbox because it was to be administered to Debra on an "as-needed" basis. (*Id.* at 127-128). McClintock testified, "A home health aide is not allowed to handle medications, so they legally cannot give a pain medicine, so we allow the caregivers in that case to administer pain medicines[,]" which are prescribed on an as-needed basis. (*Id.*).

**{¶37}** According to McClintock, Debra "was very hopeful. She wanted to get better." (*Id.* at 99). McClintock testified that Debra could not reach the counter where her medication was stored. (*Id.* at 138). She testified that Debra's wheelchair was kept in another room, which was located behind the kitchen, and not near Debra's bed. (*Id.* at 100). She further testified that Debra was not able to get out of her bed on her own, and that she could not "even get to the bedside commode by herself." (*Id.* at 100-101).

**{¶38}** McClintock testified that, after Debra was released from the hospital on August 21, 2013, "Nursing was going out - - it started out daily for nine weeks until she got her wound vac. * * * We did not have a home health aide going in

there, but we did have nursing going in." (*Id.* at 97-98). McClintock testified that Costell complained to her,

> When we did not have a home health aide going in there - - it was per his choice after [Debra] come [sic] home the second time from the nursing home - - he would complain about having to get up in the middle of the night to put her on the bedside commode and how it hurt his back and how he wasn't getting much sleep.
>
> He would complain about having to roll her and turn her, even though we had educated him on the importance of preventing further breakdown with the wounds, because it hurt his back and to do it every two hours was interfering with rest time. So there was a lot of complaints like that.

(*Id.* at 130-131). She further testified that Costell complained to her regarding the financial burden:

> He would complain about * * * the electric bill * * *, but he would complain about how her supplies cost so much money and how this cost - - you know, the hospital bed and getting her to and from her doctors' appointments because we would use an ambulette service to get her to and from the doctors' appointments.

(*Id.* at 131). Yet, McClintock testified that Debra's services that she received from McClintock's company were paid for by Medicaid. (*Id.* at 132).

**{¶39}** On cross-examination, McClintock testified that she did not perform Debra's assessment for her 485 plan. (*Id.* at 141). She also testified that she did not fill Debra's pillbox. (*Id.* at 143). McClintock testified that the nurses "would call in the scripts to the pharmacy for refills" when they would notice that a pill bottle needed to be refilled. (*Id.* at 144). She testified that she assumed the nurses would not refill a prescription if the pill bottle was not empty. (*Id.* at 145). McClintock testified that Costell's financial-burden complaints would have been alleviated if he put Debra in the nursing home. (*Id.* at 149-150).

**{¶40}** On redirect examination, McClintock testified that Costell's time-related complaints would have been alleviated if he would have authorized the full amount of home healthcare to which Debra was entitled. (*Id.* at 150).

**{¶41}** Nora L. Fox ("Fox") testified that she provided in-home nursing care, for approximately 45-60 minutes, one-two times per week, for Debra from November 2012 through the time at which Debra was hospitalized.[2] (*Id.* at 58-60, 76, 80, 85). Fox testified that Debra "was alert and oriented, answered questions, asked questions[.]" (*Id.* at 63-64). According to Fox, the only care that Debra was

---

[2] Fox testified that she stopped providing in-home nursing care for Debra when Debra "went to the hospital," which Fox thought was in August or September 2013. (*See* Apr. 14, 2015 Tr., Vol. I, at 87). The record reflects that Debra went to the hospital in July 2013. (*See* Apr. 14, 2105 Tr., Vol. II, at 239).

able to provide for herself included "reach[ing] over and get[ting] a drink, but that's about it." (*Id.* at 64).

**{¶42}** Fox testified that she filled Debra's pillbox with her medication each week according to Debra's "485 plan," which was established by Dr. Muniyappa. (*Id.* at 69). According to Fox, Debra's medications were kept in the kitchen under the counter—approximately four to five feet from Debra's bed—in a locked box. (*Id.* at 69-70). Fox testified that Debra was not able to reach the box from her bed—that is, to reach the box, Debra would "have had to get out of the bed and walk around the corner of the wall, go over to the sink and get the key, and then come back and unlock it." (*Id.* at 70). Fox testified that Costell controlled the key to the box and kept the key by a windowsill above the kitchen sink. (*Id.* at 71). Fox testified that Costell "would stand there and watch" while she was filling Debra's weekly pillbox. (*Id.*). Fox testified that she did not know how often Costell would provide Debra the Tramadol. (*Id.* at 73). She testified that Costell would dispense Debra's medication to her from her weekly pillbox by handing it to her in a "little plastic cup" and giving her a drink. (*Id.* at 73-74). Fox testified that she never saw any medication in Debra's bed, on the floor around her bed, or under her pillow. (*Id.* at 74).

**{¶43}** On cross-examination, Fox testified that she filled Debra's weekly pillbox with Tramadol. (*Id.* at 80). She also testified that Costell unlocked the

pillbox for her at first, but then told her where the key was for her to unlock it herself. (*Id.* at 81). Fox testified that she did not hear Costell make any statements about wanting to hurt Debra or wanting her to die. (*Id.* at 83).

{¶44} On redirect examination, Fox testified that she did not think Debra was suicidal. (*Id.* at 84).

{¶45} Sandra K. Cox ("Cox") testified that she provided wound care "every day" for Debra from May to June 2013. (Apr. 14, 2015 Tr., Vol. II, at 206-208). Cox testified that Debra was diagnosed with two stage IV decubitus ulcers—"one on the upper part of her coccyx and then one on the ischium, which is the bottom cheek of her buttocks." (*Id.* at 208). According to Cox, "The one on the upper part of her buttocks was almost as deep as [her] fist would go in. The one on the ischium, which is the bottom portion of her buttocks, was about a golf ball size with depth." (*Id.* at 209). She further testified that the two wounds were "tunneling" together. (*Id.* at 210). According to Cox, she knew Debra's wounds were painful because she "would cry when [they] would do the dressings[,]" requiring "having to take gauze and other dressings and push inside the wound[,]" "and she would also make sounds of ouch, that hurts." (*Id.*). Cox testified that Costell observed while Debra's wound dressings were changed. (*Id.*).

{¶46} Cox further testified that she setup Debra's weekly pillbox according to her 485 plan. (*Id.* at 212). She testified that Debra's medications were kept in a

lockbox, which was maintained in the kitchen underneath a shelf and the key "was in a little figurine, like a corn, up on the shelf," and that Debra could not reach either herself. (*Id.* at 214, 215). According to Cox, she did not put Debra's pain medications—including the Tramadol—in her weekly pillbox because Costell did not want her to have the pain medication because "the pain meds made her loopy and he didn't want that." (*Id.* at 211, 214). She testified that she did not know what happened to the pain medication that was being ordered but not provided to Debra. (*Id.* at 214). Cox testified that she offered Debra pain medication but Costell told her that Debra did not need it. (*Id.* at 221).

{¶47} Cox testified that Debra's oxygen was turned off "[m]any times" and, when Costell was confronted about turning off her oxygen, he said "that we wasn't [sic] the one that was paying the bills - - the electric bills and that was raising his bills and that she didn't need it anyway." (*Id.* at 220). Cox confirmed that the oxygen was medically necessary for Debra. (*Id.*). When Debra's oxygen levels were low, she would be confused. (*Id.*).

{¶48} On cross-examination, Cox testified that Costell would not allow anyone to give Debra pain medications, including the Tramadol. (*Id.* at 225-226). She confirmed that she did not put Debra's Tramadol in her pillbox because it was an as-needed medication. (*Id.* at 226). Cox identified State's Exhibit 39 as a copy of a notepad in which she made notations regarding Debra's medications. (*Id.* at

227). Specifically, Cox testified that she noted that she "added three pills a day [of the Tramadol] in [Debra's] medi-planner"—that is, Cox testified that she noted in the notepad that she was putting Debra's Tramadol in her pillbox as of May 20, 2013. (*Id.* at 227, 228-229). (*See also* State's Ex. 39). She testified that she did not know if Costell provided to Debra to ingest all of the medications that Cox put in Debra's pillbox but that the weekly pillbox was empty when she would refill it. (Apr. 14, 2015 Tr., Vol. II, at 228).

{¶49} Donna Lutz ("Lutz") testified that she provided in-home nursing care for "an hour and a half or so" "two or three days a week" for Debra from May through June 2013 and "seven days a week" from June through July 2013. (*Id.* at 230-232). Lutz testified that she would typically arrive at the Costell residence between 10:00 and 11:00 a.m. and leave between 1:00 and 1:30 p.m. (*Id.* at 244).

{¶50} Lutz testified that she would fill Debra's pillbox. (*Id.*). She testified that Debra's medications were maintained in a "heavy metal, like a steel container" in the kitchen and the key was "on the other side of the kitchen next to the refrigerator up in a ceramic dish." (*Id.* at 244-245). According to Lutz, Costell allowed her access to the "steel container" with Debra's medications so that she could refill Debra's pillbox each week. (*Id.* at 245). Lutz testified that, although she did not see Costell administer Debra's medications to her, Costell dispensed Debra's medications from her pillbox to Debra and that "[h]e would

always just report to us that either he had or had not given her meds." (*Id.* at 246-247). She testified that she did not know what happened to the medications that were in Debra's pillbox, but she testified that the pillbox was empty when she would refill it. (*Id.* at 247-248). She further testified that she did not find any medication around Debra's bed, on the floor, or inside Debra's bed. (*Id.* at 256).

**{¶51}** Lutz testified that Debra could not get out of bed. (*Id.*). Lutz recalled a conversation with Costell regarding Debra's bedsores, "He stated if she was a horse, he could take her out in the back and put her out of her misery." (*Id.* at 242).

**{¶52}** According to Lutz, Costell "was upset that it took money to take care of [Debra], that she was a burden." (*Id.* at 235). Lutz continued,

> [Costell] would always make sure that I understood how good of a life that he had prior to [Debra's] injury and prior to us having to come out there, and what a burden the cost was on him as far as money * * * which was very difficult to understand because she was part * * * of the Medicaid program, so her Medicaid would take care of her medications and her supplies and her visits; so as far as a burden monetary [sic], it didn't make sense.

(*Id.* at 236). She also testified, "The electricity was an issue because of her concentrator that had her oxygen. He was always complaining about how that

-26-

would drain him because that was coming out of his pocket and that was not covered by Medicaid." (*Id.* at 236-237). According to Lutz, Costell also complained about the noise that Debra's oxygen concentrator emitted, "He said it was too loud [because] there's an alarm system * * * and he didn't like that * * * because that was too loud and it would awaken him when he was sleeping." (*Id.* at 237-238). Lutz testified, "Several times that I would get there, she would be difficult to arouse and you would check her oxygenation and it would be in the low 80s." (*Id.* at 238). Lutz testified that, eventually, Debra "had difficulty [with her oxygenation level] every day that [Lutz] was there" and required hospitalization in mid-July 2013. (*Id.* at 239).

{¶53} On cross-examination, Lutz testified that Costell did not want Debra to take Vicodin and testified that she did not remember whether Debra was prescribed Tramadol. (*Id.* at 258). She testified that Costell told her that he gave Debra her medications and that she did not see any indications that Debra was not taking those medications—other than that she was not taking Vicodin. (*Id.* at 261-262).

{¶54} Susan Steigerwald ("Steigerwald") testified that she provided "a total of six visits" of in-home nursing care for Debra for a two-week period in September 2013. (*Id.* at 270-271). Steigerwald testified that she last saw Debra on September 20, 2013. (*Id.* at 272). She testified that her "job was to change the

wound vac, change the dressing," and to setup Debra's medications "on a weekly basis." (*Id.* at 271, 272). Steigerwald identified State's Exhibit 13 as Debra's 485 plan and testified that she setup Debra's weekly pillbox in accordance with that plan. (*Id.* at 273). (*See also* State's Ex. 13). Regarding the pillbox, she testified, "If you're doing a weekly med setup, you go through and fill up all the a.m. medications for Monday through the following Sunday and the noon medications, evening medications, and night medications." (Apr. 14, 2015 Tr., Vol. II, at 274). She testified that she did not put as-needed medications in the pillbox. (*Id.* at 274-275). Steigerwald testified that, when she filled Debra's pillbox on September 20, 2013, she did not put the Tramadol in the pillbox because it was prescribed to Debra on an as-needed basis. (*Id.* at 275-276). As an as-needed prescription, Steigerwald testified that Costell was responsible for administering the Tramadol to Debra when she needed it. (*Id.* at 276). Regarding Debra's Sertraline, Steigerwald testified that she put one tablet for each day in her pillbox. (*Id.*).

{¶55} Steigerwald testified that, when she last saw Debra five days before her death, there was nothing about Debra's chronic conditions that concerned her. (*Id.* at 278). Steigerwald testified that, when she learned of Debra's death, she thought to herself, "Wow, that seems weird" "[b]ecause she had a chronic condition. There was nothing acutely wrong with her when I left. Her vital signs were all stable." (*Id.* at 279).

{¶56} On cross-examination, Steigerwald testified that she filled Debra's pillbox on September 20—a Friday—and that if another nurse filled it on the following Monday, "she would have just been filling up several days." (*Id.* at 281). She testified that she would spend approximately one hour in the Costell residence when she would provide Debra nursing care. (*Id.* at 282).

{¶57} Linda Murphy Tripla ("Tripla") testified that she provided in-home nursing care twice for Debra, one of those visits being on September 23, 2013—two days before her death. (*Id.* at 283, 285). Tripla identified State's Exhibit 15 as a true and accurate copy of the September 23, 2013 skilled-nursing visit notes that she created from her care of Debra that day. (*Id.* at 286). Tripla testified that State's Exhibit 15 reflects that she set up Debra's medications "for one week per [the 485-plan] order." (*Id.* at 286-287). (*See also* State's Exhibit 15). Tripla testified, "I remember that there were already medications set up, but I filled in like a couple days of medications and that was per Mr. Costell's request." (Apr. 14, 2015 Tr., Vol. II, at 288). She testified that, because Tramadol was prescribed to Debra on an as-needed basis, she did not put it in her pillbox. (*Id.* at 288-289). She further testified, to ensure that a patient receives the correct medication, "You look at the 485, the orders, and then you have to look at your prescription bottles so that way, you know, see the medication name, the milligram, make sure you're getting the right, you know, dosage of medication." (*Id.* at 289). Tripla testified

that she followed this procedure for Debra's medications on September 23, 2013. (*Id.* at 290).

{¶58} On cross-examination, she confirmed that there were already pills in Debra's pillbox and that she set up Debra's medications for "only like two days" since "the previous nurse had been there two days prior and set the medications up." (*Id.* at 291). According to Tripla, she did not put in Debra's pillbox any of Debra's medications that were prescribed on an as-needed basis because she "never put a[n as-needed prescription] in a routine pill pack. Even at a request, I have never done that before." (*Id.* at 292). However, she testified that the statement that she provided to Detective Justice in April 2014 reflects that she put Debra's Vicodin in her pillbox. (*Id.* at 292, 293). Tripla testified that she does not know why her statement to Detective Justice reflects that because Debra's Vicodin was prescribed on an as-needed basis and she does not "remember putting Vicodin in" the pillbox. (*Id.* at 292-293).

{¶59} On redirect examination, Tripla testified that she did not have Debra's 485 plan to reference when she was interviewed by Detective Justice. (*Id.* at 293-294).

{¶60} Catherine Spradlin ("Spradlin") testified that she provided home-health aid services for Debra from May to June 2013 "five days a week" from 8:00 a.m. until 1:00 p.m. (*Id.* at 161, 163, 168). Specifically, she testified that she

"made sure [Debra] was clean and dry in the mornings, * * * [gave] her bed baths, turn[ed] her, ma[de] her as comfortable as [she] could, ma[de] sure she ate, drank, all that stuff." (*Id.* at 161). Spradlin testified that Costell "would tell [Debra] it was her fault that he couldn't work, it was her fault that the bills wasn't [sic] paid, it was her fault that he couldn't do nothing [sic]. It was always her fault because she was stuck in bed." (*Id.* at 169). According to Spradlin, she could not administer medication to Debra as a home-health aide, only "the nurse and the family" could administer medication to Debra. (*Id.* at 173).

{¶61} On cross-examination, Spradlin confirmed that she did not "touch" any of Debra's medications, but testified that she saw Costell put Debra's medications "in a little - - like a medicine cup and put it on her nightstand" and saw Debra take the medications provided by Costell. (*Id.* at 176-177). According to Spradlin, Debra's nurse would stage Debra's medications in the pillbox, Costell would get the medications out of the pillbox, and Debra would take them. (*Id.* at 177). She further testified that she did not ever see a time when Debra did not take her medications, "[s]he always took them when [Spradlin] was there." (*Id.* at 177-178). Spradlin testified that she did not have access to the pillbox. (*Id.* at 177). According to Spradlin, Debra told her that she wanted to go back to the nursing home because "she would have got better treatment." (*Id.* at 178). She further

testified that Debra told her that she wanted to go back to the nursing home, before and after she "got the catheter," "because she was in pain." (*Id.* at 179).

{¶62} Cheri Simpkins ("Simpkins") testified that she provided home-health aid services for Debra Monday through Saturday from June 18, 2013 through July 8, 2013. (*Id.* at 181-182). She testified that she worked with Debra from 8:00 a.m. until 5:00 p.m. Monday through Friday and from 8:00 a.m. until 12:00 p.m. on Saturdays. (*Id.* at 182). Simpkins testified that she did not provide services on Sundays because "Costell told the company he didn't want any help on Sundays because it was family day." (*Id.* at 183). She testified that she would "get [Debra] up in the mornings, * * * give her a shower, * * * change her bed, [and] get her dressed." (*Id.* at 183-184). Simpkins testified that, because Debra was bedridden, Simpkins would assist Debra with getting to her bedside commode, help her get into her wheelchair, and help her sit up so that she could eat. (*Id.* at 186). According to Simpkins, Debra could not even "roll in her bed. You had to help her move. You had to help roll her to get out of bed." (*Id.*).

{¶63} Simpkins testified that Debra's medications were kept "[i]n a lockbox" to which only Costell and the nurses had access. (*Id.* at 193-194). She testified that she saw Costell provide Debra her medication in a little cup and that she saw Debra take her medication. (*Id.* at 194). According to Simpkins, she

never saw any medication on the floor or in Debra's bed. (*Id.*). She testified that she changed Debra's sheets every day. (*Id.*).

{¶64} According to Simpkins, money was not an issue for Costell because he told her "that he would be able to get money if he needed money." (*Id.* at 191). Simpkins testified Costell told her that "if [Debra] wasn't around, then he could have a job and have everything he wanted"; however, Simpkins testified that Costell could have gotten a job since Simpkins provided care for Debra from 8:00 a.m. to 5:00 p.m. Monday through Friday. (*Id.* at 195).

{¶65} On cross-examination, Simpkins testified that Debra told her "please don't let them put me in a nursing home, tell them no." (*Id.* at 198-199).

{¶66} Dr. Kenneth Gerston ("Dr. Gerston"), deputy coroner of the Franklin County Coroner's Office, testified that he autopsied Debra's body. (Apr. 15, 2015 Tr. at 12, 15-16). Dr. Gerston identified State's Exhibit 24 as his autopsy report for Debra. (*Id.* at 27). Dr. Gerston testified that his "internal examination [of Debra's body] revealed that she had a slightly enlarged heart for a woman her size." (*Id.* at 24). However, he testified that he did not find anything that would indicate that she suffered a heart attack. (*Id.* at 31). He further testified, "In the lungs I didn't find anything special except that the pulmonary parenchyma, that is the functioning tissue air sacs of the lungs, were very spongy, so she probably had some emphysema." (*Id.* at 24). Regarding Debra's liver, Dr. Gerston testified that

her liver's weight was normal, and that her "liver's texture and appearance was [sic] normal and under the microscope was normal, so she had a normal liver." (*Id.* at 25). Dr. Gerston further testified that he did not see any indication that she had liver disease. (*Id.*). Regarding Debra's kidneys, Dr. Gerston testified that her kidneys were normal and that he did not see any indication that she had kidney disease. (*Id.* at 25-26). Dr. Gerston testified that he withdrew vitreous fluid from Debra's eyes, which was examined by a toxicologist. (*Id.* at 26). According to Dr. Gerston, the toxicology study of Debra's eye's vitreous fluid revealed that she did not have any kidney or liver issues. (*Id.*).

{¶67} Dr. Gerston testified that he could not determine Debra's cause of death from the anatomical findings of his autopsy; rather, he determined Debra's cause of death from the toxicology reports, which revealed the "high level of Sertraline, that is therapeutic high, meaning that somewhat higher than a normal amount than you would expect to find in the blood for a patient taking that and a toxic to lethal level of Tramadol[.]" (*Id.* at 27-28). Dr. Gerston testified that, based on the results of the toxicology report, he determined Debra's cause of death to be "acute intoxication by the combined effects of Sertraline and Tramadol." (*Id.* at 28). Dr. Gerston clarified, "Acute meaning that this would occur within a short time, say hours." (*Id.*). Dr. Gerston testified that he reported his findings to

the Union County Coroner, Dr. Applegate, and identified State's Exhibit 23 as his letter to Dr. Applegate explaining his findings. (*Id.* at 29).

{¶68} On cross-examination, Dr. Gerston testified that he received a summary of Debra's medical history prior to conducting his autopsy. (*Id.* at 32-33). However, he testified that, while he had heard that Debra was diagnosed with Korsakoff syndrome, he was not provided that diagnosis in writing. (*Id.* at 34). Dr. Gerston testified that Korsakoff syndrome, a progressive disease, "might" "[i]n some cases" have an effect on a person's liver. (*Id.* at 34-35). However, he testified that he would not have been able to tell what stage Debra's Korsakoff syndrome was because it is a "clinical diagnosis." (*Id.* at 35).

{¶69} Dr. Gerston also clarified that Debra's "therapeutically high level of Sertraline" "means that the level in the blood is higher than what one would expect with normal dosage and normal metabolism of the drug." (*Id.* at 35-36). Dr. Gerston testified that a person's body could cause a higher-than-normal level if it is not metabolizing the drug normally; however, he testified that Debra was normally processing Sertraline because "[t]here is only one organ in the body that would process it and that was the liver, and the liver was found to be normal." (*Id.* at 36-37). Regarding the Tramadol, Dr. Gerston testified that the "most common cause" for a high level of that drug "would be an overdose." (*Id.* at 37). However, he testified, "Another cause would be that the body, the liver in this case, wouldn't

metabolize it; but as I pointed out, the liver is normal and it would be capable of metabolizing." (*Id.*). Dr. Gerston further elaborated,

> If a liver cannot metabolize a particular substance, we generally see changes under the microscope. These changes either could be due to degeneration or death of liver cells. It could be due to psoriasis, which is scarring of the liver. It could be due to the accumulation of fat in the liver. None of which we found.

(*Id.* at 38).

{¶70} On redirect examination, Dr. Gerston testified that Tramadol is metabolized by "[t]he liver principally and then excreted by the kidney." (*Id.* at 40). He confirmed that Debra's kidneys were normal. (*Id.* at 40-41). Dr. Gerston testified that State's Exhibit 25 reflects that O-Desmethyltramadol—"one of the prime metabolites or first major metabolite of Tramadol"—"is fairly high." (*Id.* at 41). He further testified that the presence of this metabolite indicates that Debra was "perfectly capable" of metabolizing Tramadol. (*Id.*). Dr. Gerston testified that Debra's enlarged heart and emphysema combined with the Sertraline and Tramadol contributed to her death. (*Id.* at 41-42, 43). That is, according to Dr. Gerston, Debra's enlarged heart would make her sensitive to arrhythmia and "a toxic to lethal level of a drug [such as Tramadol] which would increase the levels of a substance called serotonin in the blood and Sertraline, which certainly inhibits

the uptake of serotonin, the effect would be to make the heart very sensitive to arrhythmias." (*Id.* at 42). He also testified, the "O-Desmethyltramadol has some respiratory depressive effects. Tramadol does too but not as much as morphine." (*Id.* at 42-43).

**{¶71}** On re-cross examination, Dr. Gerston testified that the Tramadol itself could have caused Debra's death because "[t]hat's why the level is listed as toxic to lethal. It depends on the individual. Some individuals react differently to it, depending on the length of time they're taking the drug." (*Id.* at 45-46). Dr. Gerston also testified that the O-Desmethyltramadol, as Tramadol's first metabolite, could also have contributed to Debra's death—it could depress respiration to some extent. Tramadol itself has little effect on the respiration, but it's prime metabolite has some effect on it." (*Id.* at 46).

**{¶72}** Calvin McGuire ("McGuire"), the chief toxicologist of the Franklin County Coroner's Office at the time of Debra's death, testified that he conducted toxicology tests on Debra. (Apr. 14, 2015 Tr., Vol. II, at 295, 297). McGuire identified State's Exhibit 26 as his October 23, 2013 toxicology report of his findings from his examination of Debra's blood. (*Id.* at 298-299). McGuire testified the results of his testing showed that Debra had "[a] high therapeutic level"—".68 micrograms per milliliter"—of Sertraline in her blood and a "toxic to lethal" level—"2.0 micrograms per milliliter"—of Tramadol in her blood. (*Id.* at

301-302). According to McGuire, "a high therapeutic level" means that "[i]t's just the upper end of the therapeutic level of drugs in a person's system." (*Id.* at 302). More specifically, he testified, "if a person is given the right dosage of drug, they'll be at a therapeutic level. And there's a range on the therapeutic level from low therapeutic to high therapeutic, and it's just - - she was on the high therapeutic level." (*Id.*). He further testified that "toxic to lethal" "depends on a person's tolerance * * * for some people that could be a toxic level and for other people that could be a lethal level." (*Id.* at 302-303).

{¶73} On cross-examination, McGuire testified that he could not recall whether he was provided with Debra's medical history. (*Id.* at 304). He testified that his toxicology report is based only on Debra's blood sample. (*Id.* at 305).

{¶74} Daniel D. Baker, IV ("Baker"), the current[3] chief toxicologist of the Franklin County Coroner's Office identified State's Exhibit 25 as a true and accurate copy of his April 2, 2014 toxicology report for Debra. (Apr. 15, 2015 Tr. at 7, 10-11). Baker testified that State's Exhibit 25 reflects that 240 nanograms per milliliter of O-Desmethyltramadol was found in Debra's blood. (*Id.* at 11).

{¶75} Dr. Laureen Marinetti ("Dr. Marinetti"), forensic toxicology director at Redwood Toxicology Laboratory in Santa Rosa, California, testified that Detective Justice requested that she review and interpret Debra's toxicology

---

[3] Baker became the chief toxicologist at the Franklin County Coroner's Office on January 1, 2015 after McGuire retired. (*See* Apr. 14, 2015 Tr., Vol. II, at 295); (Apr. 15, 2015 Tr. at 7).

report.  (*Id*. at 47, 53).  Dr. Marinetti identified State's Exhibit 28 as a true and accurate copy of the report that she prepared based on her review of Debra's autopsy, toxicology report, prescription medication history, and Detective Justice's death-investigation report. (*Id.* at 53-53).

{¶76} Dr. Marinetti testified that, based on her review of those records, she was able to determine Debra's prescription levels and find the corresponding "published ranges" expected to be found in a person's blood for those medications.  (*Id.* at 54, 56).  Regarding the published ranges, Dr. Marinetti testified that the ranges are determined "where individuals are given these doses and then their blood is drawn and a concentration is measured so that there's some idea of what a concentration at a particular dose should look like."  (*Id.* at 56-57).  However, Dr. Marinetti testified that because people absorb and metabolize drugs differently, "it's really hard to get a number and say that every person is going to be exactly this concentration of drug if they take exactly this dose, which is why there is a range."  (*Id.* at 57).  According to Dr. Marinetti, the linear relationship between a blood concentration and the number of pills ingested varies by person because each person does not absorb and metabolize drugs at the same rate.  (*Id.* at 59).

{¶77} Dr. Marinetti testified that Debra's Sertraline concentration "was approximately 11 times higher than the high end of the range"—.68—and the

range is .016 to .06. (*Id.* at 57-58). Dr. Marinetti testified that "the highest range would still be consistent with a therapeutic range or an expected range concentration." (*Id.* at 58). Regarding the Tramadol concentration, Dr. Marinetti testified that Debra's Tramadol concentration was "five times higher" than the highest end of the expected range. (*Id.*). Dr. Marinetti clarified, during the court's examination, that Debra's Tramadol concentration was 2.0, and the expected range for Tramadol is .18 to .38. (*Id.* at 70). According to Dr. Marinetti, Debra's blood concentration "could have been an acute or a one-time large dose or it could have been a large dose on top of a dose that was already there." (*Id.* at 59-60). Nevertheless, she testified that Debra's blood concentration reflected large doses of Tramadol and Sertraline, which is not consistent with Debra's prescribed dosages. (*Id.* at 60-61).

{¶78} Regarding the Tramadol metabolite, O-Desmethyltramadol, Dr. Marinetti testified that its presence in Debra's blood indicates that Debra's liver was processing the Tramadol. (*Id.* at 62). Dr. Marinetti further testified that she reviewed the autopsy and vitreous-fluid-test reports to determine whether Debra was experiencing any kidney or liver issues, which she determined that Debra was not. (*Id.* at 61-62).

{¶79} On cross-examination, Dr. Marinetti testified that she was not provided Debra's medical records, was not aware that Debra was diagnosed with

Korsakoff syndrome, and did not take that diagnosis into consideration in preparing her report. (*Id.* at 63). Dr. Marinetti testified that Debra's concentration of Sertraline "is not even at the high end of therapeutic range" as Dr. Gerston testified; rather, according to Dr. Marinetti, "[i]t is in far excess of therapeutic range." (*Id.* at 64). Regarding the Tramadol, Dr. Marinetti testified that "when you look at interpreting a level of a drug, you have to look at the whole picture. You can't just look at a number." (*Id.* at 65). Dr. Marinetti did not opine, and was not requested to opine, in her report as to what caused Debra's death. (*Id.* at 66).

{¶80} On redirect examination, Dr. Marinetti testified that Debra's O-Desmethyltramadol concentration was approximately two times higher than the published ranges. (*Id.* at 67). Regarding the effects of large dosages of Tramadol and Sertraline, Dr. Marinetti testified,

> [Debra's] ranges for both of these drugs I would consider toxic to lethal, so the side effects being produced are going to be serious in nature, both on the brain and on the heart.
>
> They both can cause increased heart rate, can cause increased blood pressure. They can cause seizures. They can cause a type of like myoclonic jerking, kind of like a jerk. They can also cause depression of consciousness.

Both of these drugs inhibit a neurotransmitter called serotonin and that's good if you don't do too much because it helps treat depression; but if you have too much serotonin, then that's when the toxicity occurs. It's sometimes referred to as serotonin syndrome. And so with these two drugs together at elevated levels, that excess serotonin is what's producing the side effects.

(*Id.* at 67-68). She went on,

[A]lso, Tramadol can produce respiratory depression. So if you already have someone, such as Ms. Costell, who has chronic obstructive pulmonary disease and has trouble getting oxygen already and you've got a toxic level of a drug that produces respiratory depression, then you have even more oxygen deprivation to the person.

Also, if you have someone that has an enlarged heart and you have a drug that increases heart rate and increases blood pressure, that can have a toxic effect on a heart that is already enlarged.

(*Id.* at 68-69).

{¶81} As its last witness, the State presented the testimony of Dr. Applegate. (*Id.* at 132). Dr. Applegate testified that he ordered an autopsy of Debra's body after speaking with Investigator Slaughter regarding the information

relayed to him from the Ohio Department of Medicaid. (*Id.* at 134-135). He testified that Union County autopsies are performed by the Franklin County Coroner's Office. (*Id.* at 135). According to Dr. Applegate, he spoke with Costell regarding the autopsy on September 26, 2013 and described Costell as "very upset" during the conversation and that he "used a lot of profanity, vulgarity, kept incriminating himself with statements that he would be better off if she were dead, his life's been hell for the last five years." (*Id.* at 137). Dr. Applegate testified that he reviewed the Franklin County Coroner's Office's autopsy and toxicology reports and concluded that Debra's cause of death was acute intoxication of the combined effects of Sertraline and Tramadol. (*Id.* at 138). Dr. Applegate testified that his job not only requires him to determine the cause of a person's death, but also to determine the manner of their death. (*Id.* at 138-139).

{¶82} Regarding Debra's manner of death, he testified that "this is a very difficult case" and that he "initially ruled it as undetermined" because, after reviewing all of the medical records, he "could not determine who was in charge of her medicines since the medicines were what actually caused her death." (*Id.* at 139). Dr. Applegate testified that, because he ruled Debra's manner of death as undetermined, he "turned the case over to the Union County Sheriff's Office asking them to investigate and if they could provide any further information as to who was in control of her medications." (*Id.*). According to Dr. Applegate, the

Union County Sheriff's Office "came back with fairly convincing evidence that Mr. Costell was in control of her medicines at all times, and that was consistent with the nursing reports from the home agencies, that he controlled the box." (*Id.* at 139-140). Therefore, he testified that he changed his opinion on Debra's "manner of death from undetermined to homicide." (*Id.* at 140). Dr. Applegate identified State's Exhibit 30 as a true and accurate copy reflecting his findings regarding Debra's death. (*Id.*). He further testified that he did not have Dr. Marinetti's report at the time that he generated his report. (*Id.*). Yet, he testified that he reviewed Dr. Marinetti's report and thinks that her report confirms his findings. (*Id.* at 140-141).

{¶83} On cross-examination, Dr. Applegate testified that his telephone conversation with Costell on September 26, 2013 "had nothing to do about her death, no remorse there. It was about how this impacted him. That was the awkwardness." (*Id.* at 143). He also testified, "I have no opinion of who may have [caused Debra's death], but that someone did contribute to it." (*Id.* at 145).

{¶84} Thereafter, the State moved to admit its exhibits,[4] which were admitted without objection, and rested. (*Id.* at 146). Next, Costell made a Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 163-166). Costell did not

---

[4] State's Exhibits 1, 3, 7, 8, 9, 11, which was redacted, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 32, 34, 36, 39, 40, 43, 44, 45, 46, 47, 54, and 55 were admitted without objection. (Apr. 15, 2015 Tr. at 148-162). State's Exhibits 26, 29, 32, 34, and 36 were previously admitted into evidence by stipulation. (Apr. 14, 2015 Tr., Vol. II, at 264-269, 305-306); (Apr. 15, 2015 Tr. at 132, 157-158).

provide any evidence, rested, and renewed his Crim.R. 29(A) motion, which was denied. (*Id.* at 166). The case was submitted to the jury, which found Costell guilty as to the counts in the indictment. (Apr. 16, 2015 Tr. at 68-70).

{¶85} We first review the sufficiency of the evidence supporting Costell's aggravated-murder conviction. *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999).

{¶86} As an initial matter, we note that Costell offers no support for his argument that his aggravated-murder conviction is based on insufficient evidence. "[A] defendant has the burden of affirmatively demonstrating the error of the trial court on appeal." *State v. Stelzer*, 9th Dist. Summit No. 23174, 2006-Ohio-6912, ¶ 7, citing *State v. Cook*, 9th Dist. Summit No. 20675, 2002-Ohio-2646, ¶ 27. "Moreover, '[i]f an argument exists that can support this assignment of error, it is not this court's duty to root it out.'" *Id.*, quoting *Cook* at ¶ 27. "App.R. 12(A)(2) provides that an appellate court 'may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).'" *State v. Jackson*, 10th Dist. Franklin No. 14AP-670, 2015-Ohio-3322, ¶ 11, quoting App.R. 12(A)(2). "Additionally, App.R. 16(A)(7) requires that an appellant's brief include '[a]n argument

containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.'" *Id.*, quoting App.R. 16(A)(7). Not only did Costell fail to include an argument regarding how his aggravated-murder conviction is based on insufficient evidence, but Costell failed to provide citations to the authorities, statutes, and parts of the record that support his argument. However, in the interest of justice, we will address the merits of Costell's sufficiency-of-the-evidence argument. *See State v. Thomas*, 3d Dist. Mercer No. 10-10-17, 2011-Ohio-4337, ¶ 25.

**{¶87}** Viewing the evidence in a light most favorable to the prosecution, we conclude that Costell's aggravated-murder conviction under R.C. 2903.01(A) is supported by sufficient evidence. That is, a rational trier of fact could conclude that Costell caused Debra's death.

**{¶88}** Although there is no direct evidence that Costell caused Debra's death, the State presented circumstantial evidence that Costell caused Debra's death. "Circumstantial evidence and direct evidence have the same probative value." *State v. Adams*, 3d Dist. Crawford No. 3-06-24, 2007-Ohio-4932, ¶ 21, citing *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. "'When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any

reasonable theory of innocence in order to support a conviction.'" *Id.*, quoting *Jenks* at paragraph one of the syllabus. Circumstantial evidence is sufficient to support a murder conviction. *State v. Nicely*, 39 Ohio St.3d 147 (1988), paragraph one of the syllabus.

{¶89} At trial, the State presented evidence that Costell kept Debra's medications, including the Sertraline and Tramadol, in a locked box in the kitchen, and that he kept the key for the box on a shelf above the locked box's location. (Apr. 13, 2015 Tr., Vol. II, at 225-226, 242, 244); (Apr. 14, 2015 Tr., Vol. I, at 69-71, 81, 138); (Apr. 14, 2015 Tr., Vol. II, at 193-194, 214-215, 244-245); (State's Ex. 40). The State presented evidence that Costell was the only person to administer Debra's medications, and that he administered Debra's medications on September 24, 2013—the night before Debra's death. (Apr. 14, 2015 Tr., Vol. I, at 73-74); (Apr. 14, 2015 Tr., Vol. II, at 176-177, 194, 246-247); (State's Ex. 40). The State presented evidence that Debra's death was caused by the acute intoxication by the combined effects of Sertraline and Tramadol, and presented evidence that "acute" meant that her death occurred within a short period of time after taking the higher-than-prescribed doses of Sertraline and Tramadol—that is, she died within hours of taking the overdose of those medications. (*See* Apr. 15, 2015 Tr. at 28). (*See also* Apr. 14, 2105 Tr., Vol. II, at 301-303); (Apr. 15, 2015 Tr. at 11, 27-28, 35-38, 40-43, 45-46, 54-62, 64-65, 67-69, 70, 138-140); (State's

Exs. 23, 24, 25, 26, 28, 30). The State also presented evidence that Costell was the only person in the residence with Debra when she died—that is, that Tripla last saw Debra on September 23, 2013 and that there was no evidence that any other person was in the residence after September 23, 2013 and before Debra's death on September 25, 2013. (*See* Apr. 14, 2015 Tr., Vol. II, at 285); (State's Ex. 40). Moreover, the State presented evidence that Debra could not get out of bed on her own or walk—namely, the State presented evidence that Debra could not reach the portion of the kitchen where her medication was kept or reach the shelf where the key to the locked box was kept. (Apr. 13, 2015 Tr. at 288); (Apr. 14, 2015 Tr., Vol. I, at 64, 70, 100-101, 138); (Apr. 14, 2015 Tr., Vol. II, at 186, 214-215, 256). In addition, Dr. Applegate, Investigator Slaughter, and Lutz testified that Costell made incriminating statements to them. (Apr. 13, 2015 Tr., Vol. II, at 256-257); (Apr. 14, 2015 Tr., Vol. II, at 242); (Apr. 15, 2015 Tr. at 137).

{¶90} Therefore, the jury could infer that Costell caused Debra's death— that is, that Costell administered the lethal doses of Sertraline and Tramadol to Debra, which caused her death. *Accord State v. Phillips*, 3d Dist. Wyandot No. 16-13-09, 2014-Ohio-3670, ¶ 66 (concluding that the jury could infer Phillips's involvement in the crime from circumstantial evidence); *Adams*, 2007-Ohio-4932, at ¶ 23 (concluding "that there was circumstantial evidence from which the jury could make a reasonable inference of guilt"). *Compare Neeley*, 143 Ohio App.3d

at 620 (concluding that Neeley's aggravated-murder conviction was based on sufficient evidence even though "the evidence was largely circumstantial"). Accordingly, Costell's aggravated-murder conviction is based on sufficient evidence.

{¶91} Having concluded that Costell's aggravated-murder conviction is based on sufficient evidence, we next address Costell's argument that his aggravated-murder conviction is against the manifest weight of the evidence. *Velez*, 2014-Ohio-1788, at ¶ 76. Costell challenges the same element of his aggravated-murder conviction that he challenges in his sufficiency-of-the-evidence argument—that he caused Debra's death. As such, we will review only whether the jury clearly lost its way in concluding that Costell caused Debra's death and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶92} Costell argues that his aggravated-murder conviction is against the manifest weight of the evidence because "[t]he State never offered *any* proof that: (1) *any* of Debra's medications was [sic] missing; or (2) that [Costell] gave Debra an overdose of medication." (Emphasis sic.) (Appellant's Brief at 31). More specifically, Costell argues that the lack of evidence (1) that Debra "received an overdose of medication," (2) of "who gave what pills to Debra," and (3) regarding

"whether Debra hoarded any pills" is weightier than the evidence that Costell caused Debra's death. (*Id.*).

{¶93} "Even removing the lens of favorability in favor of the prosecution, through which we examine the sufficiency of the evidence, this is not an exceptional case where the evidence weighs heavily against the convictions." *State v. Suffel*, 3d Dist. Paulding No. 11-14-05, 2015-Ohio-222, ¶ 33. Regarding Debra's Tramadol, there was conflicting testimony from the nurses—who were involved in Debra's care prior to the time Debra went into the hospital in July 2013—whether they included Debra's Tramadol in her pillbox. However, Steigerwald and Tripla—the nurses who treated Debra after she was released from the hospital on August 21, 2013 through the date of her death—testified that they staged Debra's pillbox in accordance with Debra's 485 plan and put only Debra's Sertraline in the pillbox because her Tramadol prescription was an as-needed medication, and, as an as-needed medication, it is not staged in a pillbox. (Apr. 14, 2015 Tr., Vol. II, at 274-276, 286-290, 292).

{¶94} Costell further argues that the lack of an inventory of Debra's pills weighs against his conviction because it "establish[es] reasonable doubt as to whether Debra actually received an overdose of medication, who gave what pills to Debra, and whether Debra hoarded any pills." (Appellant's Brief at 31). In particular, Costell points to the inadequate chain-of-custody evidence with regard

to Debra's medications. Costell directs us to Deputy Inskeep's testimony that he took Debra's medications, which were bagged by Costell, to the Union County Sheriff's Office without inventorying the medications, and Investigator Slaughter's testimony that he later retrieved Debra's medications from the "communications room of the sheriff's department." (*Id.*, citing Apr. 13, 2015 Tr., Vol. II, at 230-231, 244). In advancing this argument, Costell appears to be making two arguments that his conviction is against the manifest weight of the evidence because of 1) inadequate chain-of-custody evidence and 2) a lack of inventory of Debra's pills.

{¶95} "A chain of custody is part of the authentication and identification requirement for the admission of evidence under Evid.R. 901." *State v. Glover*, 12th Dist. Brown No. CA2015-01-003, 2015-Ohio-3707, ¶ 30, citing *State v. Rigdon*, 12th Dist. Warren No. CA2006-05-064, 2007-Ohio-2843, ¶ 14, citing *State v. Brown*, 107 Ohio App.3d 194, 200 (3d Dist.1995). The State bears the burden of establishing a chain of custody and is required only to "'establish that it is reasonably certain that substitution, alteration, or tampering did not occur.'" *Id.*, citing *State v. Miller*, 12th Dist. Preble No. CA2002-02-004, 2002-Ohio-6109, ¶ 18 and quoting *State v. Blevins*, 36 Ohio App.3d 147, 150 (10th Dist.1987). It is the trier of fact's duty to determine whether a break in the chain of custody exists and whether any break weighs against conviction. *Id.* ("The trier of fact has the

task of determining whether a break in the chain of custody exists."), citing *State v. Blumensaadt*, 11th Dist. Lake No. 2000-L-107, 2001 WL 1116458, *4 (Sept. 21, 2001), citing *Columbus v. Marks*, 118 Ohio App. 359 (10th Dist.1963); *Glover* at ¶ 30 ("Yet, even then, any deficiencies or irregularities in the chain of custody generally go to the weight of the evidence, not its admissibility."), citing *State v. Steele*, 12th Dist. Butler No. CA2003-11-276, 2005-Ohio-943, ¶ 114.

{¶96} Although traditional chain-of-custody evidence was not presented in this case, the State presented evidence regarding the progress of the case to account for the custody of Debra's medications. *See Glover* at ¶ 35 (concluding that "although there may be some breaks in the chain of custody * * *, the State presented extensive detailed testimony from several witnesses that traced the chain of custody"). That is, the State presented evidence that the Costell residence was not treated as a crime scene because Debra's death was not initially suspicious. Debra was bedridden with numerous, severe health issues and there was no visible evidence of physical trauma. Thus, there was no suspicion that Debra died of anything other than natural causes. Similarly, because there was initially nothing suspicious about Debra's death—a scenario created by Costell—law enforcement officers had no reason to employ traditional crime-scene preservation procedures—that is, they had no reason to believe that there was a fair probability that evidence of a crime would be found.

**{¶97}** Indeed, the State presented the testimony of Deputy Inskeep and Investigator Slaughter that they were required to take from the residence Debra's medications since she died in her home. (Apr. 13, 2015 Tr., Vol. II, at 224-225, 243). Deputy Inskeep testified that he took from the residence a bag of Debra's prescription medications, which Costell already "bagged up" to provide to authorities, and that Costell voluntarily provided to him the bag with Debra's medications. Deputy Inskeep testified that he left the bag of Debra's medications in the dispatch room of the Sheriff's Office. (*Id.* at 224, 231-232). Investigator Slaughter testified that he retrieved the bag of medications from the dispatch room of the Sheriff's Office and took it to the Coroner's Office. (*Id.* at 243-244). Detective Justice testified that he retrieved the bag of medications from the Coroner's Office and provided it to Craft to inventory and review. (Apr. 15, 2015 Tr. at 94). There is no evidence that the bag of medications, or any of the medications in the bag, were altered or tampered with. Therefore, "because deficiencies or irregularities in the chain of custody generally go to the weight of the evidence, not its admissibility, it was for the jury to determine the weight to be given" to the bag of Debra's medications. *Glover* at ¶ 36, citing *State v. Corder*, 4th Dist. Washington No. 10CA42, 2012-Ohio-1995, ¶ 25 (finding conviction for aggravated trafficking offense was not against the manifest weight of the evidence resulting from a challenge to the chain of custody where the state presented

evidence that a pill presented as evidence was the same pill appellant provided to a confidential informant that was then transported to the sheriff's office and to BCI for testing) and *State v. Banks*, 5th Dist. Fairfield No. 10-CA-36, 2011-Ohio-3801, ¶ 189 (finding conviction for trafficking offense was not against the manifest weight of the evidence where the record did not "affirmatively demonstrate any substitution, alteration or tampering of the evidence").

**{¶98}** Second, there is no evidence that the jury lost its way in determining the credibility and weight of the evidence as it relates to Costell's chain-of-custody argument regarding inventory of Debra's medications. "It is well-established that it is the trier of fact who makes determinations of credibility and the weight to be given to the evidence." *Glover* at ¶ 37, citing *State v. Erickson*, 12th Dist. Warren No. CA2014-10-131, 2015-Ohio-2086, ¶ 42, citing *DeHass*, 10 Ohio St.2d 230, at paragraph one of the syllabus. "Therefore, as the trier of fact, the jury was free to believe or disbelieve all, part, or none of the [evidence] presented at trial." *Id.*, citing *State v. Birt*, 12th Dist. Butler No. CA2012-02-031, 2013-Ohio-1379, ¶ 47. As we noted above, Craft testified that he inventoried and reviewed the bag of Debra's medications that Costell provided to law enforcement on September 25, 2013. (*See* Apr. 14, 2015 Tr., Vol. I, at 47-51); (State's Ex. 19). However, there is no evidence in the record how many pills of each prescription should have remained on the date of Debra's death. Likewise, despite *any* inventory of

Debra's Tramadol, because it was prescribed as an as-needed medication, there could have been any number of pills remaining. Similarly, as an as-needed medication, there would have been no Tramadol in Debra's pillbox. Moreover, weighing in favor of Costell's conviction is the evidence that he had access to the lockbox where Debra's medications were kept—that is, because, there is no evidence of how many Tramadol or Sertraline pills should have remained at the time of Debra's death, Costell could have dispensed to Debra any number of Sertraline or Tramadol pills from the lockbox. Thus, while an initial inventory of Debra's medications was not performed at the Costell residence on September 25, 2013 when Costell first provided to Deputy Inskeep the bag of mediations, there is no indication that the jury lost its way in determining the credibility and weight of the evidence as it relates to Costell's chain-of-custody argument regarding inventory. *See Glover* at ¶ 37.

{¶99} With regard to the cause of Debra's death, Costell claims that "the State argued throughout the trial that Debra died of an overdose of Tramadol" despite "the death certificate [which] states that Debra died due to the combined effects of Sertraline and Tramadol." (Appellant's Brief at 31). Specifically, Costell argues that his conviction is against the manifest weight of the evidence because "the State argued throughout trial that Debra died of an overdose of Tramadol" and because "the State's own alleged experts could not agree on the

significance of the levels of Tramadol and Sertraline allegedly found in a sample of Debra's postmortem blood." (*Id.*).

{¶100} Regarding Costell's argument that the State argued *throughout* trial that Debra died of a Tramadol overdose, Costell points us to one instance in which the State stated in its opening argument, "The Tramadol itself - - and that's the drug that likely killed her - - as five times higher than the expected upper therapeutic range." (*Id.*, citing Apr. 13, 2015 Tr., Vol. I, at 26-27). Rather, taken in context, the State argued *throughout* its opening argument that Debra died from an overdose of Tramadol *and* Sertraline. (*See* Apr. 13, 2015 Tr., Vol. I, at 18-20, 26-28).

{¶101} Costell further argues that the jury lost its way in concluding that he caused Debra's death based on conflicting testimony of McGuire and Dr. Marinetti. Costell points us to McGuire's testimony that Debra's blood revealed .68 micrograms per milliliter of Sertraline, which he categorized as "[a] high therapeutic level" and Dr. Marinetti's characterization of that concentration as 11 times higher than the high-end of the therapeutic range. (*See* Apr. 14, 2015 Tr., Vol. II, at 301-302); (Apr. 15, 2015 Tr. at 57-58). First, McGuire and Dr. Marinetti did not offer a conclusion as to what caused Debra's death. (Apr. 14, 2015 Tr., Vol. II, at 295-306); (Apr. 15, 2015 Tr. at 66); (State's Exs. 26, 28). Rather, Dr. Gerston and Dr. Applegate unequivocally testified that Debra's death

was caused by "acute intoxication by the combined effects of Sertraline and Tramadol." (Apr. 15, 2015 Tr. at 28, 138); (State's Exs. 23, 30). While Dr. Gerston hypothesized on re-cross examination that the Tramadol or the O-Desmethyltramadol alone could have caused Debra's death and explained the reasoning behind his hypothesis, he did not change his ultimate opinion regarding Debra's cause of death. (*See* Apr. 15, 2015 Tr. at 45-46). Furthermore, Costell makes no argument with respect to how McGuire's and Dr. Marinetti's characterizations of the level of Sertraline discovered in Debra's blood weighs against his conviction. Even so, Costell's contentions do not negate the evidence that Debra died of an overdose of medication prescribed to her. Indeed, the evidence that we summarized in our sufficiency-of-the-evidence analysis supporting Costell's conviction is much weightier than the evidence against it. Most significant is the evidence that (1) Debra was alone with Costell the evening before her death; (2) she could not access her medications; (3) Costell administered Debra's medications the evening before her death; and (4) Debra died within hours of ingesting the overdose of the Sertraline and the Tramadol provided to her. For these reasons, we cannot conclude that the jury clearly lost its way in concluding that Costell caused Debra's death and created such a manifest miscarriage of justice that Costell's aggravated-murder conviction must be reversed and a new trial ordered.

**Assignment of Error No. II**

**The Misconduct of the Prosecutor During Opening Statement, Voir Dire, and Closing Argument So Tainted the Trial With Unfairness that Appellant was Denied Due Process and a Fair Trial in Violation of the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.**

{¶102} In his second assignment of error, Costell points to a number of instances—during opening statements, voir dire, and closing arguments—that he argues demonstrates prosecutorial misconduct and denied him a fair trial. Costell also argues in this assignment of error that the prosecutor engaged in misconduct by improperly introducing evidence throughout trial of other bad acts by Costell against Debra, which denied him a fair trial.

{¶103} "The test for prosecutorial misconduct during opening statements and closing arguments is whether the remarks made by the prosecutor were improper and, if so, whether they prejudicially affected a substantial right of the accused." *State v. Siefer*, 3d Dist. Hancock No. 5-09-24, 2011-Ohio-1868, ¶ 46, citing *State v. White*, 82 Ohio St.3d 16, 22 (1998). "In opening statements and closing arguments, prosecutors are entitled to some latitude regarding what the evidence has shown and the inferences that can be drawn." *Id.*, citing *State v. Ballew*, 76 Ohio St.3d 244, 255 (1996). "'"It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused."'" *Id.*, quoting *State v. Van Meter*, 130 Ohio App.3d

592, 601 (3d Dist.1998), quoting *State v. Williams*, 79 Ohio St.3d 1, 12 (1997). "However, '[a] prosecutor may state his opinion if it is based on the evidence presented at trial.'" *Id.*, quoting *State v. Watson*, 61 Ohio St.3d 1, 10 (1991), *abrogated on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390, 686 (1997).

{¶104} "'Additionally, we review a prosecutor's opening statement and closing argument in its entirety.'" *Id.*, quoting *Watson* at 10. "If, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty, even without the improper remarks, then the trial will not be deemed unfair." *Id.*, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 45, citing *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001). *See also State v. Liles*, 3d Dist. Allen No. 1-14-61, 2015-Ohio-3093, ¶ 31 ("'To establish prejudice, a defendant must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different. Thus, "[n]ot every intemperate remark by counsel can be a basis for reversal.'''"), quoting *State v. Porter*, 4th Dist. Meigs No. 10CA15, 2012-Ohio-1526, ¶ 20, quoting *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990). "Again, the touchstone of this analysis '"is the fairness of the trial, not the culpability of the prosecutor."'" *Siefer* at ¶ 46, quoting *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, ¶ 140, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982).

**{¶105}** First, Costell alleges that the prosecutor made seven impermissible comments during opening statements. Costell's trial counsel did not object to any of the prosecutor's statements that he alleges to be improper. As such, the alleged improprieties are waived, absent plain error. *State v. Smith*, 3d Dist. Hardin No. 6-14-14, 2015-Ohio-2977, ¶ 63, citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139 and *State v. Saleh*, 10th Dist. Franklin No. 07AP-431, 2009-Ohio-1542, ¶ 68. "Crim.R. 52(B) governs plain-error review in criminal cases." *State v. Bagley*, 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, ¶ 55, citing *State v. Risner*, 73 Ohio App.3d 19, 24 (3d Dist.1991). "A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice." *Smith* at ¶ 63, citing *Saleh* at ¶ 68. "We may reverse only when the record is clear that defendant would not have been convicted in the absence of the improper conduct." *Id.*, citing *State v. Williams*, 79 Ohio St.3d 1, 12 (1997). Accordingly, Costell must show both that the misconduct occurred and, absent the prosecutor's statements during opening statements, the outcome of his trial would clearly be different. *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 109.

**{¶106}** Costell does not cite any Ohio criminal cases in support of his arguments. Instead, he directs us to a Tenth Circuit Court of Appeals opinion reversing a drug conviction as a result of the prosecutor's failure to introduce

evidence to support his opening-statement claims, and Ohio civil cases discussing improper statements made by the parties during jury trials. *See U.S. v. Novak*, 918 F.2d 107 (10th Cir.1990); *Caserta v. Allstate Ins. Co.*, 14 Ohio App.3d 167 (10th Dist.1983); *Kolidakis v. Glenn McClendon Trucking Co.*, 7th Dist. Mahoning No. 03 MA 64, 2004-Ohio-3638. Those cases are not persuasive. Rather, after reviewing the prosecutor's entire opening statement, we conclude his statements were reasonably based on the evidence presented at trial. *Compare Siefer* at ¶ 48, citing *State v. Ballew*, 76 Ohio St.3d 244, 255 (1996); *State v. Smith*, 2d Dist. Montgomery No. 25462, 2013-Ohio-5345, ¶ 27 (concluding that the prosecutor's statement during opening statements regarding the defendant's guilt "were not improper, but were simply a summary of what [the prosecutor] expected the evidence to establish at the end of trial"); *State v. James*, 7th Dist. Columbiana No. 07 CO 47, 2009-Ohio-4392, ¶ 12 (concluding that the prosecutor's mention during opening statements of September 11, 2001 and "the prosecutor's labeling of the shooting as an incident that changed the way one looks at the community as it constitutes a new level of violence" as fair comments on the facts of the case).

**{¶107}** The first instance of prosecutorial misconduct during opening statements to which Costell refers is when the prosecutor stated that Costell "was engaging in what 'must have been extraordinary painful sexual acts' with Debra." (Appellant's Brief at 11, quoting Apr. 13, 2015 Tr., Vol. I, at 21). Costell alleges

that this statement is improper because the medical records contradicted that those acts would have been painful for Debra. (*See id.*, citing State's Ex. 11). The evidence presented at trial showed that Costell engaged in sexual acts with Debra. The evidence presented at trial further showed that Debra's legs were in a contractured state, that she had two stage IV decubitus ulcers on her bottom, and that she had a catheter. As such, the prosecutor was simply drawing an inference—not expressing a personal belief or opinion about the credibility of a witness or the accused—that those sexual acts would have caused Debra pain. *See Siefer* at ¶ 50, citing *Ballew* at 255. Therefore, the prosecutor's statement is not improper.

{¶108} The second instance to which Costell points is the prosecutor's statement to the jury that "the nurses did not put Tramadol in Debra's pillbox when he knew there were nurses that would testify to just the opposite." (Appellant's Brief at 12, citing April 13, 2015 Tr., Vol. I, at 25, April 14, 2015 Tr., Vol. I, at 80, and April 14, 2015 Tr., Vol. II, at 228). Specifically, Fox testified on cross-examination that she filled Debra's weekly pillbox with Tramadol and Cox testified on cross-examination that she noted in State's Exhibit 39, the notepad in which she documented the medications that she staged in Debra's weekly pillbox, that she included Tramadol in Debra's weekly pillbox from May 20, 2013 until she stopped providing care for Debra in June 2013. Despite Fox's and Cox's

testimony, Fox and Cox also testified that they staged Debra's pillbox in accordance with her 485 plan. There was uncontroverted testimony that Debra's 485 plans reflected that her Tramadol prescription was to be administered to her on an as-needed basis, and, as such, was not to be staged in her pillbox. Therefore, the prosecutor's statement was reasonably based on what he thought the evidence would show at trial and was not improper.

{¶109} Costell further alleges three instances in which he claims that the prosecutor improperly made statements about what the evidence presented during trial would show. In particular, he argues that the prosecutor improperly stated that (1) Reedy "looked at Debra's file and said, 'there's really no reason this woman should have died'"; (2) "Debra did not hoard any drugs and that she would have had to save up a large number of drugs to overdose herself"; and (3) Costell did not want Debra to have a catheter and "without [the catheter] her ulcers would 'rot.'" (Appellant's Brief at 12-13, quoting April 13, 2015 Tr., Vol. I, at 16, 21, 23, and citing April 13, 2015 Tr., Vol. II, at 284 and State's Exs. 11, 65, 152). Costell cannot establish that the outcome of his trial would have clearly been different because none of these statements are improper. Indeed, the prosecutor did not express a personal belief or opinion about the credibility of a witness or the accused; rather, the prosecutor's statements were "fair comment" based on the

evidence to be presented at trial. *See Siefer* at ¶ 48; *Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, at ¶ 113, 115.

**{¶110}** Sixth, Costell contends that the prosecutor made improper legal arguments during his opening statements when he suggested to the jury:

> "[U]nder the law of Ohio, a caregiver - - and Jon Costell is defined
>
> as a caregiver - - has to give everything that is reasonably necessary
>
> for a person under the law. He should have given her pain medicine.
>
> He should have given her an appropriate dosage of medication."

(Appellant's Brief at 12-13, quoting Apr. 13, 2015 Tr., Vol. I, at 29-30). Costell argues that this statement took from the hands of the jury whether he failed to provide for his functionally impaired wife. The prosecutor's statements did not result in plain error. *See Smith*, 80 Ohio St.3d at 110 ("concluding that the prosecutor's "mere reference to [] legal concepts * * * did not result in prejudicial or plain error"). R.C. 2903.16(A) provides,

> No caretaker shall knowingly fail to provide a functionally impaired person
>
> under the caretaker's care with any treatment, care, goods, or service that is
>
> necessary to maintain the health or safety of the functionally impaired
>
> person when this failure results in physical harm or serious physical harm
>
> to the functionally impaired person.

Costell does not dispute that he was Debra's caretaker. Moreover, the prosecutor is entitled "wide latitude" in setting up for the jury what the evidence will show, and the State presented testimony that Costell did not administer Debra's pain medication to her because he did not like the side effects. Furthermore, the jury heard the trial court's instructions regarding the law at issue in the case. (*See* Apr. 16, 2015 Tr. at 50-65). Therefore, even if the prosecutor's statement is improper, there is no evidence that the result of Costell's trial would have clearly been different.

{¶111} Finally, Costell argues that the prosecutor "recounted to the jury inadmissible hearsay during [his] opening statement." (Appellant's Brief at 13). Specifically, Costell points to the prosecutor's comments that Debra told her nurses "no" when they asked if she wanted pain medication "because of [Costell]," and the prosecutor's statements regarding Reedy's review of Debra's medical records after her death, which caused Reedy to request law enforcement to investigate Debra's death. (*Id.*, citing Apr. 13, 2015 Tr., Vol. I, at 10, 11, 16, 21). The jury was instructed that the prosecutor's opening statements are not evidence. (Apr. 16, 2015 Tr. at 48). *See State v. Risner*, 3d Dist. Logan No. 8-12-02, 2012-Ohio-5954, ¶ 28; *State v. Tapke*, 1st Dist. Hamilton No. C-060494, 2007-Ohio-5124, ¶ 78. "We must presume that the jury followed the trial court's

instructions when deliberating in this matter." *Risner* at ¶ 28, citing *State v. Downing*, 9th Dist. Summit No. 22012, 2004-Ohio-5952, ¶ 51.

**{¶112}** Furthermore, by telling the jury that Debra would decline pain medication when her nurses would ask her if she wanted pain medication because Costell did not want her to have pain medication, the prosecutor was illustrating for the jury what he expected the evidence he intended to introduce would show. "In general, a statement made by counsel of the evidence that he expects to introduce is not reversible error unless it appears that counsel made the statement in bad faith, even if it turned out that such evidence was incompetent." *Id.* at ¶ 27, citing *State v. Neal,* 10th Dist. Franklin No. 95APA05-542, 1996 WL 28765, *12, quoting *State v. Lipker*, 16 Ohio App.2d 21 (4th Dist.1968). Indeed, the prosecutor introduced the testimony of Debra's nurses that Costell did not want Debra to have pain medication. The prosecutor also introduced the testimony of Debra's nurses that Debra would decline pain medication if Costell was present when they were providing nursing services for Debra.

**{¶113}** In addition, Reedy's testimony was not inadmissible hearsay because it was not introduced to prove the truth of the matter asserted; rather, it was introduced to show why she did what she did as part of her investigation. (*See* Apr. 13, 2015 Tr., Vol. II, at 281-282); *Tapke* at ¶ 79. Therefore, taken in the context of the entire trial, Costell did not demonstrate that the prosecutor's

statements are improper or that the result of his trial would have clearly been different absent those statements.

**{¶114}** Second, Costell alleges three instances of prosecutorial misconduct during voir dire. Costell did not object to any of the comments he alleges to be improper. Therefore, we review for plain error.

**{¶115}** Costell first argues that the prosecutor elicited improper medical testimony from prospective jurors in front of the entire venire. (Appellant's Brief at 16-17, citing Apr. 13, 2015 Tr., Vol. I, at 105-108, 116-117). The prosecutor was attempting to identify and remove prospective jurors who would rely on their experience caring for decubitus ulcers and experience with Tramadol or Sertraline—that is, the prosecutor was inquiring into the perspective jurors' attitudes and potential biases, which is not error. *See State v. Montgomery*, 5th Dist. Fairfield No. 14-CA-49, 2015-Ohio-3066, ¶ 27. *See also State v. Nields*, 93 Ohio St.3d 6, 39 (2001) (noting that a prosecutor is permitted to argue facts in evidence during voir dire), citing *State v. Lott*, 51 Ohio St.3d 160, 165 (1990).

**{¶116}** Costell also argues that the prosecutor improperly "told the potential jurors that it was okay for them to have formed opinions 'whether it's how sad this case is or how tragic it is, or how senseless it is.'" (Appellant's Brief at 17, quoting Apr. 13, 2015 Tr., Vol. I, at 73). Costell's argument is erroneous. Read in context, the prosecutor immediately followed that statement with the

question, "but any of those opinions that would affect your ability today as a fair and impartial juror?" (Apr. 13, 2015 Tr., Vol. I, at 73). None of the prospective jurors indicated that they had formed an opinion about the case that would affect their impartiality. (*Id.*).

{¶117} Thirdly, Costell argues that the prosecutor improperly inflame[d] the passions of the potential jurors and taint[ed] the entire venire by inquiring if they believed being a caretaker would be stressful:

"Would you also agree that - - caring for somebody day in and day out, do you believe that would give you an excuse to abuse or neglect or even cause the death of that person? Anybody agree with that?

How many of you have children? A lot of you. Grandchildren? A lot of you as well. Caring for - - children can be stressful, would you agree? Would you agree that just because it may be stressful, none of you think it's okay to abuse or neglect or murder a child; is that correct? I didn't think so. Okay."

(Appellant's Brief at 17-18, quoting Apr. 13, 2015 Tr., Vol. I, at 103). Clearly, the prosecutor was inquiring into the potential jurors' attitudes and biases, which, as we noted above, is not error. *Montgomery* at ¶ 27.

{¶118} Finally, Costell alleges three instances of prosecutorial misconduct during closing arguments that he claims denied him a fair trial. Because Costell did not object to any of the prosecutor's statements during closing arguments, we review his arguments for plain error. Reviewing the prosecutor's closing argument in its entirety, none of the statements of which Costell complains amount to plain error. As we noted above, the prosecutor has some latitude during closing arguments to summarize for the jury what the evidence has shown and what inferences can be drawn from that evidence. *Siefer*, 2011-Ohio-2868, at ¶ 46, citing *White*, 82 Ohio St.3d at 22. Indeed, the three instances to which Costell points us fall within that latitude.

{¶119} Costell points us to the prosecutor's statement,

"Dr. Marinetti told you what would happen after she took this level of drugs. Spasms and twitching, her heart would speed up, she - - heart rate would go up, her blood pressure would go up. She'd have respiratory depression. And during that period of time, Jon Costell was there after he had given her the drugs. This wasn't a quick death and he did nothing."

(Appellant's Brief at 19, quoting Apr. 15, 2015 Tr. at 21). Costell argues that the prosecutor's statement was improper because

> Dr. Marinetti never testified as to how Debra died or how long it would have taken her to die, presuming the reported levels of the medications were accurate. What Dr. Marinetti did testify to were possible side effects, which were anything from an increased heart rate to respiratory depression.

(*Id.*, citing Apr. 15, 2015 Tr. at 68). Costell's argument is meritless because the prosecutor was summarizing Dr. Marinetti's testimony regarding the potential side effects from taking higher-than-prescribed doses of Sertraline and Tramadol and was inferring how Debra would have died based on that testimony. Furthermore, while Dr. Marinetti did not testify to how Debra died or how long it would have taken her to die, Dr. Gerston and Burke testified to the side effects from overdoses of Sertraline and Tramadol, and Dr. Gerston and Dr. Applegate testified as to Debra's cause of death. Thus, the prosecutor's statements were within the realm of permissible summary and extrapolation.

{¶120} Second, Costell argues that the prosecutor improperly told the jury that "Debra 'would have needed a good number of drugs' when [the prosecutor] knew there had been no testimony to support [that] argument." (Appellant's Brief at 19, April 16, 2015 Tr. at 15-16). In particular, Costell argues that it was improper for the prosecutor to tell the jury,

"You can infer that you'd have to take 11 pills to get to 11 times higher than the upper dose, upper range. The Tramadol, three pills a day taken in accordance with it would have a particular range. It was five times higher. Three pills times five is another 15 pills."

(*Id.*, quoting April 16, 2015 Tr. at 15-16). Similar to that argument, Costell further alleges that the prosecutor improperly argued in his closing argument, "Now if you are taking care of somebody and you're supposed to give them one pill and there's 11 there. If you're supposed to give them 3 pills a day and there's 15 there, you're going to know the difference." (Appellant's Brief at 20, quoting Apr. 16, 2015 Tr. at 41). Again, Costell's arguments are meritless because the prosecutor's statements are based on the evidence presented at trial and are permissible inferences based on that evidence. *See Siefer*, 2011-Ohio-1868, at ¶ 46.

{¶121} Costell further argues in this assignment of error that the prosecutor engaged in misconduct when he introduced evidence throughout trial of "other bad acts" by Costell against Debra which deprived him of a fair trial—namely that the prosecutor improperly told the jury during opening statements that the Sheriff's Office "had been called to the house 'just six weeks' before Debra died with the implication being that [Costell] harmed Debra in some way." (Appellant's Brief at 22-23, quoting Apr. 13, 2015 Tr., Vol. I, at 6). Also, Costell argues that it was

improper to elicit testimony from (1) "the 911 operator about other runs to the house"; (2) "Paul Slaughter about [Costell's] other legal issues"; and (3) Debra's nurses and Debra's caseworker "about other instances of alleged abuse." (Appellant's Brief at 23, citing Apr. 13, 2015 Tr., Vol. II, at 200, 239, Apr. 14, 2015 Tr., Vol. II, at 201-203, and Apr. 15, 2015 Tr. at 118-119).

**{¶122}** "Generally, evidence which tends to show that the accused has committed other crimes or acts independent of the crime for which he stands trial is not admissible to prove a defendant's character or that the defendant acted in conformity therewith." *State v. Hawthorne*, 7th Dist. Columbiana No. 04 CO 56, 2005-Ohio-6779, ¶ 24, citing *State v. Elliot*, 91 Ohio App.3d 763, 770 (3d Dist.1993) and Evid.R. 404. "Evidence of other crimes, wrongs, or acts" "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 16, quoting Evid.R. 404(B). Typically, "[a] trial court is given broad discretion in admitting and excluding evidence, including 'other bad acts evidence." *State v. Williams*, 7th Dist. Jefferson No. 11 JE 7, 2013-Ohio-2314, ¶ 7, citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). However, because Costell failed to object to the introduction of this evidence, we review for plain error, which Costell concedes. (*See* Appellant's Brief at 23).

{¶123} The evidence of which Costell complains was admissible for a purpose other than showing that he acted in conformity with the character or reputation suggested by that evidence. *See State v. Dotson*, 2d Dist. Clark No. 2003 CA 34, 2004-Ohio-6875, ¶ 16. Rather, the testimony of which he complains is relevant to proving the charges against Costell. *See Williams*, 2013-Ohio-2314, at ¶ 7. That is, Costell was charged with aggravated murder, failing to provide for a functionally impaired person, domestic violence, and involuntary manslaughter. Taken in context, the testimony was introduced to address elements of the charges facing Costell. Therefore, even if we assume the prosecutor's statements are improper, Costell did not demonstrate that the result of his trial would have clearly been different absent those statements.

{¶124} Costell alleges several instances in this case that he argues were error on the part of the prosecutor. However, "Error is not necessarily misconduct. Indeed, most error is not." *State v. Reynolds*, 2d Dist. Montgomery No. 19780, 2003-Ohio-7245, ¶ 46. "Prosecutorial misconduct, like ineffective assistance of counsel, necessarily involves an attorney's failure to conform to clear professional standards." *Id.* "'The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor."'" *State v. Johnson*, 3d Dist. Allen No. 1-13-45, 2014-Ohio-4750, ¶ 88, quoting *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 231, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982). Thus,

even assuming that there was error, Costell presented no evidence, and we see none, that the result of the trial would have been different. *See Pickens*, 2014-Ohio-5445, at ¶ 128. Indeed, Costell received a fair trial.

{¶125} Costell's second assignment of error is overruled.

### Assignment of Error No. I

**The Trial Court Committed Structural Error and Violated the Defendant's Due Process Rights to a Fair Trial When it Instructed the Parties to Give an Opening Statement Prior to Voir Dire, and Did So Without Any Admonishment to the Venire that Opening Statements Are Not Evidence. The Trial Court Committed Further Structural Error When it Did Not Dismiss the Venire After It Was Tainted by Comments From One of the Prospective Jurors, By Prosecutorial Misconduct, and When it Did Not Control the State's Improper Voir Dire.**

{¶126} In his first assignment of error, Costell argues that the trial court committed structural error by instructing the parties to give opening statements prior to voir dire without admonishment to the venire that opening statements are not evidence. Costell further argues in this assignment of error that the trial court committed structural error when the venire was tainted by comments from one of the perspective jurors. Thirdly, Costell argues in this assignment of error that the trial court erred by failing "to control numerous instances of prosecutorial misconduct that occurred during voir dire." (Appellant's Brief at 9).

{¶127} "A structural error is a constitutional defect that defies analysis by harmless error standards, because it affects the framework within which the trial

proceeds, rather than simply being an error in the trial process itself." *State v. Fields*, 12th Dist. Butler No. CA2005-03-067, 2005-Ohio-6270, ¶ 27, citing *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 17.

> Structural error affects the substantial rights of a criminal defendant, even absent a specific showing that the outcome of the trial would have been different, and requires automatic reversal. Because a defendant is relieved of his burden to show prejudice, the finding of structural error is rare and limited to exceptional cases.

*State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, ¶ 53 (Moyer, J., concurring in judgment only), citing *Perry* at ¶ 18, citing *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544 (1997). The "'limited class of cases'" recognizing structural error are cases "in which the errors permeate the 'entire conduct of the trial from beginning to end,' so that the trial court cannot '"reliably serve its function as a vehicle for determination of guilt or innocence."'" *Fields* at ¶ 27, quoting *Arizona v. Fulminante*, 449 U.S. 279, 309-310, 111 S.Ct. 1246 (1991), quoting *Rose v. Clark*, 478 U.S. 570, 577-578, 106 S.Ct. 3101 (1986). Those "limited number of cases in which structural errors have been recognized include "a total deprivation of the right to counsel; lack of an impartial trial judge; unlawful exclusion of grand jurors of the defendant's race; the right to self-representation at trial; the right to a public trial; erroneous reasonable doubt

instruction to the jury." *Id.*, quoting *Johnson v. United States*, 520 U.S. 461, 468-469, 117 S.Ct. 1544 (1997). To begin with, we must examine whether the errors that Costell alleges to be structural errors are errors.

{¶128} Trial courts have inherent discretion in controlling the order of trial proceedings. *See State v. Malloy*, 2d Dist. Clark No. 11CA0021, 2012-Ohio-2664, ¶ 23. Indeed, R.C. 2945.03 provides:

> The judge of the trial court shall control all proceedings during a criminal trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue.

"Under R.C. 2945.03, the trial court reserves the right and responsibility to control the proceedings of a criminal trial." *Blumensaadt*, 2001 WL 1116458, at *10, citing *State v. Cornwell*, 86 Ohio St.3d 560 (1999). We review the trial court's decision to instruct the parties to present opening statements prior to voir dire for an abuse of discretion. *See State v. Walker*, 2d Dist. Clark No. 08-CA-32, 2009-Ohio-1936, ¶ 25. An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). However, because Costell did not object to the trial court's instruction, we review for plain error. *See Perry* at ¶ 23 (concluding that the

failure to raise a structural error to the trial court waives all but plain error on review); *Walker* at ¶ 24.

{¶129} The trial court's instruction to the parties to present opening statements before voir dire did not amount to plain error. The trial court explained to the prospective jurors why it altered the customary sequence of voir dire questioning and opening statements: "The opening statements will be given so that you as jurors will know what the case is about and then you'll be able to answer questions as to whether or not you can be a fair and impartial juror in the case." (Apr. 13, 2015 Tr., Vol. I, at 6). *See also Walker* at ¶ 22-23. We cannot say that the record clearly reflects that Costell would have been acquitted had the trial court not instructed the parties to provide opening statements prior to voir dire. *Compare State v. Dale*, 2d Dist. Montgomery No. 2012 CA 20, 2013-Ohio-2229, ¶ 38, citing *Walker* at ¶ 24. *See also U.S. v. Goode*, 814 F.2d 1353, 1355 (9th Cir.1987) (concluding that the trial court did not abuse its discretion by ordering the parties to present opening statements before voir dire); *U.S. v. Keese*, 992 F.2d 1001, 1002 (9th Cir.1993) (observing that the trial court "invited counsel to make opening statements prior to voir dire, and the government did so"); Larsen, *Navigating the Federal Trial*, Section 5:41 (2015) (noting that opening statements are sometimes made before voir dire because "[t]he argument in favor of this practice is that it allows the panelists to know the facts and understand the

issues before answering questions concerning their qualifications to serve on the jury"). Because it was not error for the trial court to instruct the parties to give opening statements prior to voir dire, there can be no structural error.

{¶130} Costell further argues under this assignment of error that a second structural error occurred "when a prospective juror tainted the entire venire with her emotional explanation of why she could not sit through [Costell's] trial." (Appellant's Brief at 7). Specifically, Costell argues that the prospective juror's comments rose to the level of structural error because the "comments demonstrate[d] that she believed the State's opening statement was evidence, and, moreover, that it was true." (*Id.*). In support of his argument, Costell cites *Mach v. Stewart*. 137 F.3d 630 (9th Cir.1997). In *Mach*, the Ninth Circuit Court of Appeals concluded that there was a structural error, which resulted from "the jury's exposure during voir dire to an intrinsically prejudicial statement made four times by a children's social worker, [that] occurred before the trial had begun, result[ing] in the swearing in of a tainted jury, and severely infect[ing] the process from the very beginning." *Id.* at 633.

{¶131} In particular, Costell points us to the prospective juror's statement:

[Prospective Juror]:  I just buried my dad in December and he was also bedridden back and forth for many years. There was no way that he would have been kept in the

condition that [the victim] was kept. He was taken care of. My mom was right there by him and so were we no matter what happened.

And at no point was he ever treated - - no matter how least [sic] there was an amount of people around him in a wet condition, bed sores that become that bad - - I'm sorry. I just - -

[Trial Court]: You understand you haven't heard any of the evidence yet. You've just heard an opening statement as to what the State thinks. You feel like you couldn't sit and listen to the evidence and - -

[Prospective Juror]: I can't sit through this.

(Apr. 13, 2015 Tr., Vol. I, at 42-43). The prospective juror was then excused.

**{¶132}** We review Costell's argument for plain error since he failed to object to the juror's comments or move for a mistrial as a result of those comments. *See State v. Smith*, 9th Dist. Summit No. 22550, 2006-Ohio-158, ¶ 5. The potential juror's comments do not amount to plain error. There is nothing in the record that indicates that the potential juror's statements biased the other veniremen. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 98; *State v. Sanders*, 92 Ohio St.3d 245, 248 (2001). In *Sanders*, the Supreme Court of Ohio

declined to presume that the other veniremen were biased by hearing the remarks at issue because "[t]he usual way to find out whether a venireman harbors bias is voir dire, and Sanders could have asked that the trial court either question the other veniremen on this point, or permit the parties to do so[,]" but he "made no such request." *Sanders* at 248. Similar to the facts in *Sanders*, Costell failed to ask the trial court to either question the other veniremen to find out whether they harbored bias or permit the parties to do so. As such, we decline to presume that the other veniremen were biased. *Yarbrough* at ¶ 98, citing *Sanders* at 248; *State v. Brooks*, 2d Dist. Montgomery No. 18502, 2001 WL 1295285, *1 (Oct. 27, 2001). Furthermore, it was not plain error for the trial court to fail to provide either a cautionary instruction to neutralize the effect of the venireman's statements or question the other veniremen to determine whether the comments affected their impartiality. *Yarbrough* at ¶ 98. Nevertheless, the trial court provided at least a minimal instruction to the prospective juror that no evidence had been presented.

{¶133} Moreover, the Ninth Circuit Court of Appeals case on which Costell relies in support of his argument is distinguishable from the facts of this case, and was distinguished by the Supreme Court of Ohio in *Sanders*. *See id*. "*Sanders* makes clear that bias should only be presumed when a potential juror makes repeated, definite statements of opinion concerning a matter germane to trial."

*Smith*, 2006-Ohio-158, at ¶ 7, citing *Sanders* at 248. Indeed, unlike the potential juror in *Mach* who made "repeated, definite statements of opinion concerning a matter germane to the trial—a matter in which she also appeared to be an expert," the venireman in this case expressed only her opinion, did not speak at length, and was immediately excused. *Id.*, citing *State v. Doerr*, 193 Ariz. 56, 62, 969 P.2d 1168 (1998) and *Lucero v. Kerby*, 133 F.3d 1299, 1308-1309 (10th Cir.1998). *See also Smith* at ¶ 7; *Brooks* at *1. Moreover, the venireman expressed an opinion about herself and was immediately excused for cause. *Compare Brooks* at *1. Therefore, Costell cannot demonstrate that the outcome of his trial would clearly have been different. As such, since there is no error stemming from the potential venireman, there is no structural error.

{¶134} Third, Costell argues in this assignment of error that the trial court "committed structural error when it failed to control numerous instances of prosecutorial misconduct that occurred during voir dire." (Appellant's Brief at 9). As we noted in our discussion in Costell's second assignment of error, Costell did not object to any of the instances he claims to be prosecutorial misconduct during voir dire, let alone raise to the trial court the issue of structural error; therefore, we review Costell's argument for plain error. Based on our conclusion in Costell's second assignment of error, there were no instances of prosecutorial misconduct for the trial court to control. As such, there is no plain error.

{¶135} Costell's first assignment of error is overruled.

**Assignment of Error No. V**

**It Was Plain Error to Admit Debra's Death Certificate Because It States Her Caregiver Caused Her Death.**

**Assignment of Error No. VII**

**The Trial Court Erred When it Allowed Kim Reedy to Testify to Inadmissible and Highly Prejudicial Hearsay Evidence Over Objection of Defense Counsel Thereby Denying Appellant a Fair Trial and Due Process of Law as Guaranteed By the Fourteenth Amendment to the United States Constitution and Deprived Appellant of his Sixth Amendment Rights.**

**Assignment of Error No. IX**

**Trial Court Erred When it Admitted Irrelevant, Gruesome, Repetitive and Substantially Prejudicial Photographs of the Deceased in Violation of [Costell's] Constitutional Rights.**

{¶136} In his fifth, seventh, and ninth assignments of error, Costell raises evidentiary issues. In his fifth assignment of error, Costell argues that the trial court erred in admitting Debra's death certificate without redacting it. In his seventh assignment of error, Costell argues that the trial court erred in admitting hearsay testimony. In his ninth assignment of error, Costell argues that the trial court erred in admitting irrelevant photographs of Debra's decubitus ulcers.

{¶137} Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

"Under Evid.R. 403(A), '[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.'" *Velez*, 2014-Ohio-1788, at ¶ 122, quoting *State v. Maag*, 3d Dist. Hancock Nos. 5-03-32 and 5-03-33, 2005-Ohio-3761, ¶ 71. "'Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.'" *Id.*, quoting *State v. Calhoun*, 11th Dist. Ashtabula No. 2010-A-0057, 2012-Ohio-1128, ¶ 82. "'[D]espite the mandatory terms of Evid.R. 403(A), when considering evidence under that rule, the trial court is vested with broad discretion and an appellate court should not interfere absent a clear abuse of that discretion.'" *State v. Nevins*, 171 Ohio App.3d 97, 2007-Ohio-1511, ¶ 49 (2d Dist.), quoting *State v. Harding*, 2d Dist. Montgomery No. 20801, 2006-Ohio-481, ¶ 21.

{¶138} Generally, the admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of discretion and material prejudice. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). As we noted above, "an abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable." *Adams,* 62 Ohio St.2d at 157. However "if the party wishing to exclude evidence fails to contemporaneously object at trial when the evidence is presented, that party waives for appeal all but plain error." *Bagley*,

2014-Ohio-1787, at ¶ 53-54, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 59-60, *State v. Barrett*, 4th Dist. Scioto No. 03CA2889, 2004-Ohio-2064, ¶ 20, and *State v. Lenoir*, 2d Dist. Montgomery No. 22239, 2008-Ohio-1984, ¶ 19. As we stated above, for us to find plain error, an appellant "must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors." *Id.* at ¶ 55.

{¶139} In his fifth assignment of error, Costell argues that it was plain error to admit Debra's death certificate because it impermissibly states that "Debra died because her caregiver, who the State told the jury was [Costell], gave her a lethal dose of her prescription medication." (Appellant's Brief at 30, citing State's Ex. 30). In particular, Costell argues that it was plain error to admit the death certificate without redacting that portion of the death certificate.

{¶140} The Revised Code authorizes a coroner to inquire "'how the deceased came to his death, whether by violence to self or from other persons, *by whom*, whether as principals or accessories before or after the fact, and all circumstances related thereto.'" (Emphasis added.) *State v. Harrison*, 1st Dist. Hamilton No. C-920422, 1993 WL 293971, *2 (May 12, 1993), quoting R.C. 313.17. Once the coroner makes that determination, "R.C. 313.19 makes the coroner's verdict and death certificate the 'legally accepted manner and mode in which such death occurred, and the legally accepted cause of death[.]'" *State v.*

*Cousin*, 5 Ohio App.3d 32 (3d Dist.1982), paragraph one of the syllabus, *abrogated on other grounds*, *State ex rel. Blair v. Balraj*, 69 Ohio St.3d 310 (1994). However, a coroner's verdict and death certificate are the legally accepted manner, mode, and cause of a person's death "only as to the physiological cause of death and the immediate mechanical, chemical or biological means by which death was caused, but *does not extend to the determination of the criminal responsibility of any human agency involved in the causal chain*." (Emphasis added.) *Id.* Indeed, Dr. Applegate, who was subject to cross-examination by Costell, testified that he concluded Debra died as the result of a homicide but further testified that he did not have an opinion as to who caused Debra's death. (Apr. 15, 2015 Tr. at 145). *See State v. Stewart*, 11th Dist. Ashtabula No. 2001-A-0011, 2002-Ohio-3842, ¶ 46 (the coroner's testimony regarding the decedent's cause of death was not prejudicial because it concluded only that her "death was caused by another person, as opposed to suicide and natural causes, and no criminal responsibility was assigned to appellant"); *State v. Cohen*, 11th Dist. Lake No. 12-011, 1988 WL 41545, *15 (Apr. 29, 1988) (concluding that the coroner's testimony concluding that the victim's death was the result of violent means was admissible because there was there was no testimony implicating the defendant in the victim's death"), citing *State v. Woodards*, 6 Ohio St.2d 14, 24 (1966); *State v. Thomas*, 11th Dist. Trumbull No. 3342, 1985 WL 7783, *2 (concluding that the trial court

erred in admitting the coroner's verdict because the defendant objected to its admission and the defendant did not have the opportunity to cross-examine the coroner). Thus, it was not plain error for the trial court to admit the death certificate or plain error for the trial court to not redact the death certificate. *See Woodards* at 24 (concluding that the death certificate, containing conclusions that the victim died as a result of being beaten by an unknown assailant, was admissible because it did not name the assailant).

{¶141} In his seventh assignment of error, Costell argues that the trial court erred by permitting inadmissible and prejudicial hearsay testimony. In particular, Costell argues that the trial court erred by permitting Reedy to testify "to what someone else had written or noted in a file" in the CareStar records. (Appellant's Brief at 32-33). While Costell objected to Reedy's testimony as being improper hearsay, the trial court did not abuse its discretion by permitting Reedy's testimony because it was not hearsay and was relevant for the jury. First, Reedy's testimony regarding her review of Debra's records as part of her death review for the Ohio Department of Medicaid was offered to explain her actions in pursuing her investigation and not for the truth of the matter asserted. *See Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, at ¶ 117 (concluding that a law enforcement officer's testimony that Davis became a suspect as a result of "information from an out-of-state law enforcement agency" was not hearsay because it was offered to explain

the law enforcement officer's actions in opening the investigation and not for the truth of the matter asserted). Because Debra's death was caused by the overdose of her medication—not visible signs of trauma—Reedy's testimony regarding the investigation of Debra's death was relevant for the jury to understand how medical professionals concluded that she died as the result of a homicide. *See id.* (concluding that the law enforcement officer's "reasons for opening the investigation were relevant and helped provide the foundation for his subsequent testimony).

{¶142} In his ninth assignment of error, Costell alleges that the trial court erred by admitting two autopsy photographs depicting Debra's decubitus ulcers. In particular, Costell argues that these photographs were irrelevant to Debra's cause of death. "'Under Evid.R. 403 * * *, the admission of photographs is left to the sound discretion of the trial court.'" *State v. Ream*, 3d Dist. Allen No. 1-12-39, 2013-Ohio-4319, ¶ 101, quoting *Maurer*, 15 Ohio St.3d at 264. "A trial court may reject a photograph, otherwise admissible, due to its inflammatory nature, if the prejudicial effect outweighs its probative value." *Id.*, citing Evid.R. 403 and *Maurer* at 264-65. "However, 'the mere fact that [a photograph] is gruesome or horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury.'" *Id.*, quoting *Woodards,* 6 Ohio St.2d at 25. "Autopsy photographs are generally admissible to

help the jury appreciate the nature of the crimes, to illustrate the coroner's or other witnesses' testimony by portraying the wounds, to help prove the defendant's intent, and to show the lack of accident or mistake." *State v. Shakoor*, 7th Dist. Mahoning No. 01CA121, 2003-Ohio-5140, ¶ 73, citing *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 52.

**{¶143}** While Costell initially objected to the photographs being introduced during trial, he did not object to their admission into evidence. (Apr. 15, 2015 Tr. at 18-19, 155). Generally, the failure to object to the admission of evidence waives all but plain error on review. *State v. Coley*, 93 Ohio St.3d 253, 265 (2001). However, even under an abuse-of-discretion standard of review, Costell fails to show that the prejudicial impact of either of the two autopsy photos of which he complains outweighs their individual probative value. Indeed, there are only two photographs and those photographs are not particularly gruesome or inflammatory. *See State v. Mason*, 82 Ohio St.3d 144, 158-59 (1998). Rather, those photographs are probative to whether Costell is guilty of domestic violence or failing to provide for a functionally impaired person—that is, whether Costell recklessly caused physical harm to Debra or whether he knowingly failed to provide a functionally impaired person with treatment, care, goods, or a service that is necessary to maintain that person's health or safety and that failure resulted in physical harm or serious physical harm to that person. *See id.* at 159; R.C.

2919.25(B) and 2903.16(A). Likewise, those photos are relevant because they illustrate the testimony of the coroner and the healthcare professionals. *Mason* at 159, citing *Maurer* at paragraph seven of the syllabus. Therefore, it was not plain error or an abuse of discretion to admit the photographs.

{¶144} Costell's fifth, seventh, and ninth assignments of error are overruled.

### Assignment of Error No. III

**Defense Counsel Were Ineffective For Failure to Conduct a Proper Voir Dire Which Denied the Appellant the Right to a Fair Trial and the Right to Due Process of Law Under the Ohio and United States Constitutions. Counsel's Questions Were General and Not Specific and Counsel Did Not Address Any Potential Bias.**

### Assignment of Error No. IV

**Appellant Was Deprived of the Effective Assistance of Counsel Due to Numerous Errors and Omissions Which Prejudiced Appellant's Trial.**

{¶145} In his third and fourth assignments of error, Costell argues that his trial counsel was ineffective. In his third assignment of error, Costell alleges that his trial counsel conducted an ineffective voir dire. In his fourth assignment of error, Costell submits a laundry list of 18 instances that he alleges demonstrates that his trial counsel was ineffective during trial.

{¶146} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under

the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976), *vacated in part on other grounds*, 438 U.S. 910, 98 S.Ct. 3135 (1978).

**{¶147}** "Prejudice results when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Liles*, 3d Dist. Allen No. 1-13-04, 2014-Ohio-259, ¶ 48, quoting *Bradley* at 142, citing *Strickland* at 691. "'A reasonable probability is a

probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Bradley* at 142 and citing *Strickland* at 694.

**{¶148}** First, in his third assignment of error, Costell argues that his counsel conducted an ineffective voir dire. "When evaluating claims of ineffective assistance at voir dire, [the Supreme Court of Ohio has] 'recognized that counsel is in the best position to determine whether any potential juror should be questioned and to what extent.'" *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 225, quoting *State v. Murphy*, 91 Ohio St.3d 516, 539 (2001). "'Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors.'" *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001). The Supreme Court of Ohio has "consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.'" *Id.* at ¶ 63, quoting *Mason*, 82 Ohio St.3d at 157.

**{¶149}** Costell raises five instances where prospective jurors indicated that they knew or were related to law enforcement officers and argues that his trial counsel was ineffective for failing to further inquire about those relationships. Costell also raises two instances in which prospective jurors stated that they, or a family member, experienced domestic violence, and that his trial counsel was

ineffective for failing to further inquire into those situations. Finally, Costell argues that his trial counsel was ineffective because he "did not ask jurors Pendergast and Livingston any questions, nor did he inquire of the two alternate jurors." (Appellant's Brief at 24). Costell's arguments are meritless. "'This Court has previously held that when jurors demonstrate during voir dire that they are able to remain fair and impartial, no action will lie for ineffective assistance of counsel for not seeking their removal.'" *State v. Brooks*, 3d Dist. Defiance No. 4-08-09, 2008-Ohio-6188, ¶ 20, quoting *State v. Bofia*, 3d Dist. Henry No. 7-03-12, 2004-Ohio-3018, ¶ 14, citing *State v. Hill*, 3d Dist. Paulding No. 11-03-07, 2003-Ohio-5123, ¶ 29. All of the prospective jurors of which Costell complains indicated that they would be able to remain fair and impartial despite their relationships or experiences.[5] (*See* Apr. 13, 2015 Tr., Vol. I, at 54, 57-59, 86).

{¶150} Costell further argues in his third assignment of error that his trial counsel was ineffective during voir dire for failing to use his last preemptory challenge. "[T]he decision whether to dismiss a juror using preemptory challenges is a trial tactic." *Bofia* at ¶ 14, citing *Hill* at ¶ 30. "Debatable trial tactics, without more, will not be grounds for an ineffective assistance of counsel claim." *Id.*,

---

[5] Although prospective-juror McClain indicated to the trial court that he has "an aunt and a sister that's [sic] in a domestic situation" and that he might be able to be a fair and impartial juror, he later responded to the prosecutor's question during voir dire "Anything about that incident involving your family that would cause you not to be able to sit here today?," "I don't believe so." (Apr. 13, 2015 Tr., Vol. I, at 54-55, 85-86).

citing *Hill* at ¶ 30. Here, this was nothing more than a debatable trial tactic. As such, Costell's argument is meritless.

**{¶151}** Finally, Costell argues in his third assignment of error that his trial counsel was ineffective for failing "to object to the [trial] court's failure to swear in the venire." (Appellant's Brief at 25). Costell's argument is erroneous as the trial court placed the prospective jurors under oath prior to voir dire. (Apr. 13, 2015 Tr., Vol. I, at 38-39).

**{¶152}** For these reasons, Costell's trial counsel was not ineffective during voir dire, and his third assignment of error is overruled.

**{¶153}** We turn to Costell's fourth assignment of error in which he lists 18 instances that he argues demonstrates that his trial counsel was ineffective during trial, including allegations that his trial counsel was ineffective for failing to move for a mistrial, failing to object to testimony and the admission of evidence, failing to impeach witnesses and conducting ineffective cross-examination, and failing to file a number of pretrial motions.

**{¶154}** Costell argues that his trial counsel was ineffective for failing "to move for a mistrial after a prospective juror tainted the venire when she informed the court she could not sit through trial because her deceased grandfather would never have been treated the way Jon treated Debra."[6] (Appellant's Brief at 27).

---

[6] It was actually the prospective juror's father. (Apr. 13, 2015 Tr., Vol. I at 42).

Based on our conclusion as to Costell's first assignment of error, his argument is meritless. Also meritless based on our discussion of Costell's first assignment of error is his argument that his trial counsel was ineffective for failing to object to the trial court's "failure to give any admonishment or instruction prior to opening statements or voir dire." (*Id.*).

{¶155} Moreover, based on our conclusion in Costell's second assignment of error relative to Costell's arguments regarding other-bad-acts evidence, his argument that his trial counsel was ineffective for failing to object to that evidence is meritless. Costell neglects to acknowledge in advancing this argument that the State was also required to prove the other charges against Costell, and not only the aggravated-murder charge. Further meritless, based on our conclusion in Costell's second assignment of error, is Costell's argument that his trial counsel was ineffective for failing to object to "the prosecutor's improper and highly prejudicial opening statement, voir dire, and closing statement." (*Id.*).

{¶156} Based on our conclusion in Costell's seventh assignment of error, his argument that his trial counsel was ineffective for failing to move to redact Debra's death certificate is meritless.

{¶157} Of those 18 instances of ineffective assistance that Costell argues, 10 relate to instances in which Costell claims his trial counsel's failure to object resulted in him receiving an unfair trial. The failure-to-object arguments raised by

Costell already not meritless based on our conclusions in Costell's other assignments of error do not rise to the level of ineffective assistance of trial counsel. Those arguments include trial counsel's failure to object to: (1) several instances of Debra's healthcare professionals' testimony that Costell alleges to be "inadmissible and irrelevant character evidence"; (2) the admission of State's Exhibit 9 because there a proper foundation was not laid for its admission and seven pages were missing, and the admission of Debra's medical records because they "highlight[ed] certain information and contained allegations that [Costell] was hateful and had a drinking problem"; (3) the prosecutor asking Dr. Muniyappa a legal question; (4) "the introduction of any records or testimony that related to events prior to January 2013"; and (5) Heath's and Simmons's testimony regarding Costell's demeanor after Debra's death, as well as Investigator Slaughter's and Dr. Applegate's testimony regarding their conversations with Costell. (Appellant's Brief at 27-29). "[T]rial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance." *State v. Stairhime*, 3d Dist. Defiance No. 4-13-06, 2014-Ohio-1791, ¶ 42, quoting *State v. Turks*, 3d. Dist. Allen No. 1-08-44, 2009-Ohio-1837, ¶ 43, citing *State v. McKinney*, 11th Dist. Trumbull No. 2007-T-0004, 2008-Ohio-3256, ¶ 191, and citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 103. Indeed, Costell advances no argument that there is a reasonable probability that the

outcome of his trial would have been different based on his failure-to-object arguments. We conclude that Costell's failure-to-object arguments fall within the realm of trial tactics and do not support an ineffective-assistance-of-counsel claim.

{¶158} Costell argues that his trial counsel was ineffective for failing to impeach (1) the "State's witnesses * * * with the State's own exhibits that showed Debra could turn herself, that Debra denied any pain during intercourse, and that Debra's nurses believed that [Costell] and Debra could engage in sexual intercourse without any serious issue" and (2) "the healthcare workers' allegations that Debra had told them that [Costell] abused her * * * with the medical records depicting Debra's mental health and memory issues." (Appellant's Brief at 27, citing State's Exs. 8, 11). He also argues that his trial counsel was ineffective for questioning Lutz and Dr. Muniyappa on cross-examination "if they had ever called law enforcement to say that Debra was being abused." (*Id.* at 28, citing Apr. 13, 2015 Tr., Vol. II, at 309-310 and Apr. 14, 2015 Tr., Vol. II, at 262). "It is well settled that the scope of cross-examination is considered a trial strategy, and debatable trial tactics do not establish ineffective assistance." *State v. Alvarez*, 3d Dist. Defiance No. 4-08-02, 2008-Ohio-5189, ¶ 32, citing *Conway* at ¶ 101, citing *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 45; *State v. Campbell*, 90 Ohio St.3d 320, 339 (2000). Costell's trial counsel may have decided not to cross-examine the State's witnesses because such cross-examination would have

reemphasized the abuse allegations and bolstered the State's argument. *Compare id.* Conversely, Costell's trial counsel may have decided to cross-examine Lutz and Dr. Muniyappa regarding what they reported to law enforcement to discredit the abuse allegations. Indeed, Dr. Muniyappa testified that he did not contact law enforcement to report any suspected abuse and, although Lutz testified that she contacted law enforcement to report suspected abuse, she elaborated that law enforcement never followed up with her regarding her allegations. Thus, Costell's trial counsel's considerations are trial strategy and do not constitute ineffective assistance of counsel. *Alvarez* at ¶ 32.

{¶159} Costell argues that his trial counsel was ineffective for failing to object to the admission of Costell's prior domestic-violence judgment entries because his trial counsel stipulated to the prior convictions. Costell's argument is misplaced. The record reveals that Costell's trial counsel stipulated to the prior domestic-violence judgment entries themselves, not just the convictions as Costell argues on appeal. (*See* Apr. 14, 2015 Tr., Vol. II, at 265-266). Moreover, the failure to object and decisions regarding stipulations are matters of trial strategy and tactics. *Stairhime*, 2014-Ohio-1791, at ¶ 42; *State v. Roy*, 10th Dist. Franklin No. 14AP-986, 2015-Ohio-4959, ¶ 22, citing *State v. Rippy*, 10th Dist. Franklin No. 08AP-248, 2008-Ohio-6680, ¶ 16, citing *State v. Edwards*, 119 Ohio App.3d

106 (10th Dist.1997), citing *United States v. Teague*, 953 F.2d 1525 (11th Cir.1992). Costell's trial counsel was not ineffective in this instance.

**{¶160}** Costell argues that his trial counsel was ineffective for "telling the venire that [Costell] might not testify, because 'I might tell him, [Costell], there's a reason why you can't testify here. I don't want you testifying.'" (Appellant's Brief at 28, quoting Apr. 13, 2015 Tr., Vol. I, at 154). In context, Costell's trial counsel was asking the venire their attitude toward a defendant that invokes his constitutional right not to testify based on his trial counsel's advice. As we acknowledged in Costell's third assignment of error, juror voir dire is a matter of trial strategy, and we are unwilling to "'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.'" *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, at ¶ 63, quoting *Mason*, 82 Ohio St.3d at 157. Moreover, the trial court instructed the jury that Costell has a constitutional right not to testify, and that the jury cannot take Costell's right not to testify into consideration during its deliberations. (Apr. 16, 2015 Tr. at 46). "A presumption exists that the jury has followed the instructions given to it by the trial court." *State v. Murphy*, 65 Ohio St.3d 554, 584 (1992).

**{¶161}** Costell argues that his trial counsel was ineffective for failing to file a number of pretrial motions: (1) a motion for a bill of particulars; (2) a motion to suppress Costell's statement to Detective Justice; (3) a motion in limine to exclude

prior bad acts; (4) a motion to redact irrelevant, prejudicial portions of the exhibits and the death certificate; (5) "a motion to sever the aggravated murder count from the balances [sic] of the charges"; and (6) a motion to dismiss the indictment based on the destruction of potentially exculpatory evidence. (Appellant's Brief at 29). The failure to file a motion is not per se ineffective assistance of counsel. *State v. Schlosser*, 3d Dist. Union No. 14-10-30, 2011-Ohio-4183, ¶ 34, citing *In re Smith*, 3d Dist. Hancock No. 5-01-34, 2002 WL 255126, *6 (Feb. 22, 2002). "Without proving that trial counsel was deficient for failing to make certain motions and that those motions had a reasonable probability of success, the ineffective assistance of counsel claim fails." *Id.* Costell failed to demonstrate that his trial counsel was deficient for failing to file any of those pretrial motions or that such motions would have been successful. Indeed, Costell makes *no* argument relative to whether *any* of those motions would have had a reasonable probability of success, and we decline to root out any possible argument. *State v. Raber*, 189 Ohio App.3d 396, 2010-Ohio-4066, ¶ 30 ("[I]f an argument exists that can support [an] assignment of error, it is not this [c]ourt's duty to root it out."). *See also* App.R. 12(A)(2); App.R. 16(A)(7).

{¶162} Finally, as we noted in Costell's second assignment of error, ineffective-assistance-of-counsel claims necessarily involve an attorney's failure

to conform to clear professional standards. *Reynolds*, 2003-Ohio-7245, ¶ 46. As such, as the Second District Court of Appeals admonished in *Reynolds*,

> while we are aware of appellate counsel's duty to represent [their] client's interests zealously, we urge [] counsel to avoid misuse of [ineffective-assistance-of-counsel] claims. * * * There is an element of perversity in the claim that mere exaggerations, or even negligent misstatements, simply don't involve.

*Id.*

{¶163} For these reasons, Costell's fourth assignment of error is overruled.

{¶164} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**